## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

TONI DEMYERS,                          )
                                       )
            Plaintiff,                 )
                                       )
vs.                                    )     Case No.:17-cv-02130
                                       )
CITY OF ST. LOUIS,                     )     **JURY TRIAL DEMANDED**
                                       )
      SERVE:                           )
      City Hall                        )
      1200 Market Street               )
      St. Louis, MO 63103              )
                                       )
CHRISTOPHER LEE JONES,                 )
                                       )
      SERVE:                           )
      5058 Northland Ave.              )
      St. Louis, MO 63113              )
                                       )
DALE GLASS,                            )
                                       )
      SERVE:                           )
      St. Louis Corrections Division   )
      200 S. Tucker Blvd.              )
      St. Louis, MO 63102              )
            Defendants,                )

## FIRST AMENDED COMPLAINT

COMES NOW, Plaintiff Toni Demyers, by and through undersigned counsel, and

for her First Amended Complaint, hereby states to this Honorable Court as follows:

### NATURE OF THE ACTION

1. This is a civil rights action brought under 42 U.S.C. 1983 against Defendant St. Louis

   City, Missouri, concerning the St. Louis City Justice Center's failure to train and/or

   supervise its correctional officers, its failure to protect inmates of the St. Louis City

   Justice Center, and it and it's officers' failure to intervene on a sexual assault on

1



Plaintiff, in violation of the Fourth, Eight, and Fourteenth Amendments to the United States Constitution. The actions and conduct of Defendants are the result of policies, practices, customs, and deliberate indifference on the part of St. Louis City, Missouri, as well as its agents, acting in both their individual and official capacities.

## PARTIES

2. The allegations contained in all aforementioned Paragraphs are hereby realleged and incorporated as if fully set forth herein.

3. Plaintiff Toni Demyers (hereinafter referred to as "Ms. Demyers" or "Plaintiff") is a female citizen of the State of Missouri, residing in St. Louis City, Missouri.

4. Defendant St. Louis City, Missouri (hereinafter referred to as "Defendant St. Louis City") is a governmental entity in the State of Missouri and owns, operates, manages, directs, and controls the St. Louis City Sheriff Department, the St. Louis City Justice Center (hereinafter referred to as "CJC"), and the Medium Security Institute (hereinafter referred to as "MSI"), and employs Defendant Dale Glass and Defendant Officer Christopher Lee Jones.

5. Defendant Dale Glass (hereinafter referred to as "Defendant Glass") is and was at all times relevant herein the Commissioner of the St. Louis City Division of Corrections. Consequently, he was a policymaker for CJC/MSI. He is sued in his official capacity.

6. Defendant Christopher Jones (hereinafter referred to as "Defendant Jones") was at all times relevant herein, a St. Louis City Sheriff Deputy assigned to CJC. He is sued both in his individual and official capacity.

## JURISDICTION AND VENUE

7.  On or about June 5, 2017, Plaintiff filed her Petition in St. Louis City Circuit Court, State of Missouri.

8.  On or about July 24, 2017, Defendants filed a "Notice to Circuit Court of St. Louis City, Missouri of Removal to Federal Court" in St. Louis City Circuit Court, State of Missouri citing 28 U.S.C. §§ 1441 and 1446 as the basis for removal.

9.  Jurisdiction and venue were proper in St. Louis City, State of Missouri pursuant to RSMo. § 508.010, and Defendants have consented to the venue of this Court by filing a Notice of Removal to the same.

10. Plaintiff's cause of action arises out of conduct that took place in St. Louis City, Missouri.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### Background

11. The allegations contained in all aforementioned Paragraphs are hereby realleged and incorporated as if fully set forth herein.

12. On or about October 12, 2016, and at all times herein mentioned, Plaintiff Toni Demyers was incarcerated as a pre-trial detainee at MSI for a charge unrelated to this matter.

13. At all times herein mentioned, Defendant Jones was a deputy sheriff employed by Defendant St. Louis City and Glass and working at the CJC.

14. One faction of Defendant Jones's duties of employment was to schedule, coordinate and facilitate the transfer of detainees to and from MSI to the CJC in order for detainees to make Court appearances in the St. Louis City Circuit Courthouse.

3

### Initial Contact with Plaintiff

15. The allegations contained in all aforementioned Paragraphs are hereby realleged and incorporated as if fully set forth herein.

16. Corrections Officer John Doe, a correctional officer stationed at MSI, has had relationships with female inmates that are outside the relationship allowable under CJC/MSI policy and procedures. These relationships began while the women were incarcerated at MSI and continued after the women left MSI.

17. The dynamic of these relationships included Corrections Officer John Doe trading food from outside MSI with the inmates in exchange for sexual favors.

18. Defendant Jones, stationed at CJC, knew of Corrections Officer John Doe and of his inappropriate relationships with female inmates housed at MSI.

19. Defendant Jones requested that Corrections Officer John Doe aid him to begin such a relationship with Ms. Demyers.

20. Corrections officer John Doe arranged for Defendant Jones to contact Ms. Demyers, initially with an oral message and later via a telephone conversation.

### The Sexual Assault

21. Subsequent to the telephone conversation, Defendant Jones scheduled a transfer of Ms. Demyers from MSI to CJC on April 20, 2017 for a "court appearance", and due to deficiencies in Defendant's system he was capable of isolating Plaintiff and placing her in his solo care without any oversight.

22. Ms. Demyers did not have a Court appearance on that date; however, she believed she did because her transfer had been ordered.

23. On April 20, 2017, Ms. Demyers arrived at the CJC for her "court appearance" and

was taken into Defendant Jones's care.

24. Without any oversight, Defendant Jones was able to force Ms. Demyers into a private holding cell.

25. Defendant Jones then told Ms. Demyers she did not have a court appearance, but rather he wanted to see her and offered food that had plainly brought from outside the facility.

26. Defendant Jones demanded Ms. Demyers eat the food while in the private holding cell.

27. Ms. Demyers acquiesced to his demand and ate the outside food.

28. Defendant Jones then stated to Ms. Demyers "[y]ou got yours, now where is mine," and he grabbed her breast, forcefully stuck his hand down her pants and inserted his fingers into her vagina.

29. This sexual assault only stopped when Defendant Jones heard another prison official in the hallway approaching the private holding cell. He then exited the private cell, leaving Ms. Demyers alone in the private holding cell.

30. This official was a second deputy sheriff who, upon seeing Ms. Demyers in the private holding cell alone, removed her, placed her in a holding cell with another female detainee, and handcuffed the two women together.

31. Defendant Jones then entered the second holding cell with Ms. Demyers and the female detainee, uncuffed Ms. Demyers from the other woman, and again forced Ms. Demyers back into the private holding cell.

32. Defendant Jones stated he was "trying to f*** the s*** out of [her], but they came too

5

fast"[1].

33. Ms. Demyers feared a second sexual assault by Defendant Jones due to his statement.

34. Another prison official was heard approaching in the hallway, and again Defendant Jones left the private holding cell.

35. This official was a third sheriff's deputy who, upon seeing Ms. Demyers in the private holding cell alone, removed her, placed her back with the other female detainee, and handcuffed the two women together.

36. Subsequently, Ms. Demyers was placed on transit back to MSI.

37. Much, or all, of the above allegations which took place at CJC were captured on film (or digitally) via CJC's closed-circuit security camera (or cameras).

38. Said film or digital file(s) is in the possession of the Defendants.

**Post-Sexual Assault**

39. Defendant Jones is currently facing felony criminal charges in the above matter.

40. The behavior of Defendant Jones as described herein occurred during the course and scope of his employment with Defendants St. Louis City and under the supervision of Defendant Glass.

41. As a direct and proximate result of the foregoing, Ms. Demyers has sustained, and continues to endure, mental and psychological injuries, personal humiliation, pain and suffering, emotional distress, stress and other damages.

42. At all times relevant herein, the conduct of Defendants was a willful, wanton and reckless disregard of Plaintiff's rights under state and federal law.

---

[1] Defendant Jones's exact statement has been edited to limit its offensiveness in a publicly viewable pleading.

6

43. Plaintiff is under information and belief that the aforementioned violations of Plaintiff's Constitutional rights are a part of a pattern and practice of similar behavior on part of the Defendants.

## JAIL POLICIES AND CUSTOMS THAT CAUSED INJURY TO PLAINTIFF

### Overall

44. CJC/MSI have a long history of inmate abuse, incident cover up, false and failed reporting, superficial accountability, subjective discipline and reward of employees, sexual harassment and misconduct, neglect, squalor, overcrowding, intimidation, questionable hiring and training, policy violations, and failed oversight. (See ACLU report marked "Plaintiff's Exhibit 1a).

45. Specifically, CJC/MSI supports and reinforces an environment which allows for correctional officers to have inappropriate relationships and to sexually abuse the inmates charged to be in their care.

46. On April 28, 2017, Defendant Jones was charged by the Circuit Attorney of St. Louis City with Felony Sexual Conduct with a Prisoner.

47. Defendant Jones is at least the third CJC/MSI employee to be charged with criminal sexual contact or assault since 2009. (A copy of the charging documents for two other corrections officers is attached hereto, marked "Plaintiff's Exhibit 1b and Plaintiff's Exhibit 1c" and made a part hereof as if fully set forth within).

48. The policies and practices described herein show an objectively deliberate indifference on the part of Defendant St. Louis City.

### CJC/MSI's Lack of Adequate Policy Governing the Transport of Prisoners

49. CJC/MSI corrections officers, guards, and other staff members, including Defendant

Jones displayed no adherence to any policy intended to govern the transport of Prisoners from MSI to CJC.

50. Defendant Jones was able to fraudulently order the transfer of the Plaintiff from the MSI without having a valid court appearance.

51. The correctional staff at MSI released Plaintiff into the custody of Defendant St. Louis City without verifying any details that Defendant Jones provided.

52. To the extent that there are policies in place to govern the transportation of prisoners, they were and are not adequately enforced, which led to a violation of Plaintiff's constitutional rights.

**CJC's Lack of Adequate Policy Allowing a Sheriff's Deputy to Isolate an Inmate**

53. CJC corrections officers, guards, and other staff members, including Defendant Jones displayed no adherence to any policy intended to prevent a Sheriff's Deputy from isolating an inmate.

54. Defendant Jones was able to isolate Plaintiff on two separate occasions without interference from supervisors or staff.

55. Further, Defendant Jones, a male, was able to isolate Plaintiff, a female, without interference from supervisors or staff.

56. These actions show a lack of adherence to any policy that would establish a system of check and balances to prevent any such isolation from occurring, which led to Plaintiff's assault and a violation of her constitutional rights.

57. To the extent that there are policies in place to protect the rights of inmates and prevent isolation, they were and are not adequately enforced, which led to Plaintiff's assault

and a violation of her constitutional rights.

## CJC's Lack of Policy Regarding Location of Inmates

58. CJC corrections officers, guards, and other staff members, including Defendant Jones and Officer John Doe displayed no adherence to any policy intended account for the location of inmates while in the custody of the CJC.

59. After Defendant Jones was able to isolate Plaintiff, a fellow Sheriff's Deputy located Plaintiff in a private holding cell with outside food containers.

60. Officer John Doe removed Plaintiff and placed her in a cell with another female inmate.

61. However, Office John Doe failed to comply with any policies that were in place to inquire as to how Plaintiff was in a cell alone.

62. To the extent that there are policies that govern the location and misplacement of prisoners, they were and are not adequately enforced, which led to Plaintiff's assault and a violation of her constitutional rights.

## St. Louis City Sheriff Department's Lack of Screening of Potential Employees

63. As stated herein, Defendant Jones is the third Sheriff's Deputy since 2009 to be charged with Sexual Conduct with a Prisoner.

64. There is not a proper screening process to ensure that those tasked with securing detainees and inmates do not violate the Constitutional rights of individuals that they are tasked with guarding.

65. To the extent that there are screening processes of potential employees, they were and are not adequately enforced.

### CJC's Lack of Policy Regarding the Monitoring of Security Camera Footage

66. The assault of Plaintiff by Defendant Jones was captured on the security cameras at the CJC.

67. Upon information and belief, the CJC does not have a policy in place requiring the live monitoring of security camera feeds.

68. To the extent that the security cameras are monitored, no actions were taken to prevent Defendant Jones from assaulting Plaintiff on two separate occasions, which led to Plaintiff's assault and a violation of her constitutional rights.

### CJC/MSI's Culture of No Reporting or Ignoring Reports of Sexual Assault

69. As stated herein, CJC/MSI corrections officers, guards, and other staff members, including Defendant Jones, knew or should have known of the actions of Corrections Officer John Doe with regard to his treatment and relationships with female inmates.

70. Plaintiff is under the information and belief that any inappropriate relationship between correctional guards and inmates must be reported to supervisors, including Defendant Glass, and those correctional officers who engage in inappropriate relationships with inmates would be disciplined by superiors, including by Defendant Glass.

71. Further, Plaintiff is under the information and belief that touching of any kind by corrections officers on an inmate is strictly prohibited, outside the need for restraint on an inmate.

72. Contrary to the above, Correctional Officer John Doe's relationships either were not reported by corrections officers, guards, or staff members who knew of the relationships – itself a policy violation – or such reports went ignored by superiors,

including Defendant Glass.

73. When inappropriate relationships and sexual assaults go unreported and/or ignored by the superiors, including Defendant Glass, it creates an environment which causes unconstitutional behavior and rights violations. As such, corrections officers, guards, and staff members either believe they do not have to report such behavior or believe they, as others have, can get away with behaving in this manner.

74. It is this environment of CJC/MSI which emboldened Defendant Jones into taking the unconstitutional actions described herein.

75. CJC/MSI and Defendant Glass show deliberate indifference and tacit authorization of correction officer and inmate relationships and sexual assault when prior violations went unaddressed.

76. Corrections Officer John Doe's collusion with Defendant Jones demonstrates how officers act together to continue and support each other in creating inappropriate relations with inmates without fear of repercussions by superiors at CJC/MSI.

77. CJC/MSI and Defendant Glass had or should have had notice of the inappropriate relationships and sexual assaults as, prior to Defendant Jones, Corrections Officer John Doe was carrying on relationships and at least two other corrections officers were charged with sexual contact or assault.

78. Ms. Demyers was injured by acts pursuant to CJC/MSI's practice of non-reporting or non-discipline of incidents of inappropriate relationships or sexual assault of inmates by correction officers.

79. Better trained and better supervised correctional officers and employees would have prevented the Plaintiff from being attacked.

**CJC/MSI and Defendant Glass's Policy of False or Incomplete Reporting**

80. CJC/MSI and Defendant Glass pursue a policy of false or incomplete reporting regarding, here specifically, the allegations of sexual assault taking place within the walls of the institutions in order to cover up the environment as described above.

81. CJC/MSI and Defendant Glass provide a monthly report which documents information on inmates and services for the City of St. Louis Division of Corrections. (See "Plaintiff's Exhibit 1d").

82. The monthly report purported to be the official numbers for the month of April 2017, lists that "Zero (0)" sexual assaults by guards to inmates were alleged during the month of April 2017 (a copy of the April 2017 report is attached hereto, marked "Plaintiff's Exhibit 1d" and made a part hereof as if fully set forth within).

83. Thus, this instant allegation by Ms. Demyers is not listed on the April 2017 report.

84. CJC/MSI and Defendant Glass underwent an investigation into the allegation and therefore knew that there was at least one allegation of sexual assault of an inmate by a corrections officer, but deliberately failed to report such in the monthly report for April 2017.

85. This false or incomplete reporting is a policy created by Defendant Glass and CJC/MSI to cover up the environment within CJC/MSI and shows deliberate indifference to the sexual assault to take place within the institutions.

86. CJC/MSI and Defendant Glass's policy decision to erase any allegation of sexual assault allows them to hide the truth, keeps public outcry and concern at a minimum, and creates the illusion that Defendant Jones and the prior two officer's sexual assaults are outlying incidents, rather than a rampant problem at CJC/MSI.

12

87. The suppression of allegations of sexual assault by CJC/MSI and Defendant Glass as supervisors reinforces the environment of non-reporting and of no discipline, as correctional officers and employees become further aware that consequences of unconstitutional behavior do not exist at CJC/MSI.

88. This known policy decision of false or incomplete reporting allowed employees of CJC/MSI, specifically Defendant Jones, to take action to perpetrate sexual assault knowing their sexual assault would be expunged from the public record by CJC/MSI and Defendant Glass.

89. Ms. Demyers was injured by this policy of false and/or incomplete reporting of sexual assaults by CJC/MSI and Defendant Glass. An institution, director, and employees who are willing to place the rights of the inmates over the public backlash or outcry from corrections officers in light of a changed environment would have prevented the attack on Ms. Demyers.

### COUNT I:
### FAILURE TO TRAIN RESULTING IN THE DEPRIVATION OF RIGHTS UNDER THE FOURTH AND FOURTEENTH AMENDMENTS, COGNIZABLE UNDER 42 U.S.C. § 1983
#### *As to Defendants St. Louis City and Dale Glass*

90. The allegations contained in all aforementioned Paragraphs are hereby realleged and incorporated as if fully set forth herein.

91. As demonstrated herein, the actions and/or inactions of Defendants, including but not limited to Defendant Jones, and other agents and/or employees of CJC/MSI deprived Ms. Demyers of her Constitutional rights to be free from an attack while in pretrial detention.

92. At all times relevant herein, Defendants, including Defendant Jones, acted under color of law prescribed to them and/or pursuant to policies, customs, and/or practices of Defendant St. Louis City.

93. At all times relevant herein, Plaintiff is under information and belief that the training polices of Defendants St. Louis City and Glass were not adequate to train their officers and employees to handle the usual and recurring situations with which they must deal.

94. Defendants St. Louis City and Glass were deliberately indifferent to the obvious consequences of their failure to train its officers and employees adequately.

95. The failure of Defendants St. Louis City and Glass to provide adequate training caused the deprivation of Ms. Demyer's rights by Defendant Jones, and others; that is, Defendants' failure to train is so closely related to the deprivation of Plaintiff's Constitutional rights as to be the moving force that caused the ultimate injury to Plaintiff.

96. Defendants St. Louis City and Glass were or should have been aware that Ms. Demyers faced a substantial risk of serious harm by failing to properly train their subordinate officers as set forth herein.

97. As a direct and proximate result of the foregoing, Ms. Demyers suffered – and continues to suffer – mental and psychological injuries, personal humiliation, pain and suffering, emotional distress, stress, and other related compensatory damages.

98. As shown by the foregoing, Defendant Jones' conduct was willful, wanton, and malicious, and showed deliberate indifference to and/or conscious disregard for the rights of others, including the rights of Plaintiff, thus justifying an award of punitive

damages in an amount sufficient to punish Defendant Jones and/or deter him and others similarly situated from such conduct in the future.

99. Plaintiff is under information and belief that the aforementioned violations of her Constitutional rights is a part of a pattern and practice of similar behavior on the part of Defendants.

100.     No Defendant is entitled to qualified immunity for their actions or inactions.

101.     Plaintiff is under information and belief that, at all times relevant herein, Defendant Glass had policymaking authority over the policies and procedures of Defendant St. Louis City and CJC/MSI that directly and proximately resulted in the deprivation of Plaintiff's Constitutional rights.

102.     Plaintiff is entitled to reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

         WHEREFORE, Plaintiff Toni Demyers prays this Honorable Court award Plaintiff damages – compensatory, nominal, and/or punitive – in such an amount in excess of $25,000.00 as is deemed fair and reasonable; for reasonable attorney's fees; for costs; for interest as allowed by law; and for such other and further relief deemed just and proper.

**COUNT II:**
**FAILURE TO SUPERVISE RESULTING IN THE DEPRIVATION OF**
**RIGHTS UNDER THE FOUTH AND FOURTEENTH AMENDMENTS,**
**COGNIZABLE UNDER 42 U.S.C. § 1983**
***As to Defendants St. Louis City and Dale Glass***

103.     The allegations contained in all aforementioned Paragraphs are hereby realleged and incorporated as if fully set forth herein.

104.     As demonstrated herein, the actions and/or inactions of Defendants including but not limited to, Defendant Jones and other agents and/or employees of CJC/MSI,

deprived Ms. Demyers of her Constitutional rights to be free from an attack while incarcerated.

105.     Defendants St. Louis City and Glass personally knew or should have known that Defendant Jones were engaging in the aforementioned acts which caused Plaintiff to face a substantial risk of serious harm.

106.     Plaintiff is under information and belief that Defendants St. Louis City and Glass provided inadequate supervision of their subordinates so as to ensure compliance with existing department (CJC/MSI) policies and procedures, as well as appropriate "industry standards".

107.     Ms. Demyers is under information and believe that the violation of Plaintiff's Constitutional rights as set forth herein were not the first committed within CJC/MSI by Defendant St. Louis City officers and employees, namely subordinates of Defendant Glass.

108.     Defendants St. Louis City and Glass made a deliberate choice not to provide adequate supervision over their subordinates.

109.     This inadequate supervision allowed for, specifically, Defendant Jones to schedule a transfer of Ms. Demyers on the premise she had a Court appearance, when she did not, and to schedule himself as the only guard assigned to her on that date.

110.     Moreover, Defendants St. Louis City and Glass should have been aware of widespread abuse, meaning abuse that was obvious, flagrant, rampant, and of continued duration thus placing Defendants on notice of the need to take corrective action through heightened supervision of their subordinates.

111.   At all times relevant herein, all individual Defendants were acting under color of law prescribed to them and/or pursuant to polices, customs, and/or practices of Defendant St. Louis City.

112.   Plaintiff is under information and belief that, at all times relevant herein, Defendant Glass had policymaking authority over the policies and procedures of Defendant St. Louis City and CJC/MSI that directly and proximately resulted in the deprivation of Plaintiff's Constitutional rights.

113.   As a direct and proximate result of the foregoing, Ms. Demyers suffered – and continues to suffer – mental and psychological injuries, personal humiliation, pain and suffering, emotional distress, and other related compensatory damages.

114.   As shown by the foregoing, Defendant Jones' conduct was willful, wanton, and malicious, and showed deliberate indifference to and/or conscious disregard for the rights of others, including the rights of Plaintiff, thus justifying an award of punitive damages in an amount sufficient to punish Defendant Jones and/or deter him and others similarly situated from such conduct in the future.

115.   Plaintiff is under information and belief that the aforementioned violations of her Constitutional rights is a part of a pattern and practice of similar behavior on the part of Defendants.

116.   No Defendant is entitled to qualified immunity for their actions or inactions.

117.   Plaintiff is entitled to reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff Toni Demyers prays this Honorable Court award Plaintiff damages – compensatory, nominal, and/or punitive – in such an amount in excess of $25,000.00 as is deemed fair and reasonable; for reasonable attorney's fees; for

17

costs; for interest as allowed by law; and for such other and further relief deemed just and proper.

## COUNT III:
### VIOLATION OF THE FOURTH, EIGHTH, AND FOURTEENTH AMENDMENTS, COGNIZABLE UNDER 42 U.S.C. § 1983
#### *As to Defendant St. Louis City*

118.     The allegations contained in all aforementioned Paragraphs are hereby realleged and incorporated as if fully set forth herein.

119.     The violations of Ms. Demyer's Constitutional rights under the Fourth, Eighth, and Fourteenth Amendments, her damages, and the conduct of the individual Defendants, including but not limited to Defendant Jones, were directly and proximately caused by the actions and/or inactions of Defendant St. Louis City, which upon inference has encouraged, ratified, and has been deliberately indifferent to the following policies, patters, practices, and customs and to the need for more or different training, supervision, investigation, or discipline in the areas of:

a.   CJC/MSI corrections officers' and employees' duties and responsibilities concerning the monitoring of inmates within CJC/MSI;

b.   CJC/MSI corrections officers' and employees' duties and responsibilities concerning the protection of inmates from attacks while in CJC/MSI;

c.   CJC/MSI corrections officers' and employees' duties and responsibilities concerning intervention on inmate attacks;

d.   CJC/MSI's failure to ensure inmates are securely held in cells awaiting court appearances;

e. The failure to prevent CJC/MSI corrections officers and employees from engaging in illegal conduct during the scope and course of their employment at CJC/MSI;

f. The failure to prevent CJC/MSI corrections officers and employees from violating policies of CJC/MSI during the scope and course of their employment at CJC/MSI;

g. The failure to identify and/or take remedial or disciplinary action against CJC/MSI corrections officers and employees who were known to be engaging in illegal activity and/or violating policies; and

h. The hiring and retention of corrections officers and employees who are unqualified for their employment position.

120.   Defendants demonstrated objectively deliberate indifference to Plaintiff's constitutional rights through their failure to implement sufficient policies, as alleged *supra*.

121.   Defendants demonstrated objectively deliberate indifference to Plaintiff's constitutional rights through their failure to enforce policies, as alleged *supra*, that would guard against such violations.

122.   As a direct and proximate result of the foregoing, Ms. Demyers suffered – and continues to suffer – mental and psychological injuries, personal humiliation, pain and suffering, emotional distress, and other related compensatory damages.

123.   As shown by the foregoing, Defendant Jones' conduct was willful, wanton, and malicious, and showed deliberate indifference to and/or conscious disregard for the rights of others, including the rights of Plaintiff, thus justifying an award of punitive damages in

an amount sufficient to punish Defendant Jones and/or deter him and others similarly situated from such conduct in the future.

124.     Plaintiff is under information and belief that the aforementioned violations of her Constitutional rights is a part of a pattern and practice of similar behavior on the part of Defendants.

125.     No Defendant is entitled to qualified immunity for their actions or inactions.

126.     Plaintiff is entitled to reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff Toni Demyers prays this Honorable Court award Plaintiff damages – compensatory, nominal, and/or punitive – in such an amount in excess of $25,000.00 as is deemed fair and reasonable; for reasonable attorney's fees; for costs; for interest as allowed by law; and for such other and further relief deemed just and proper.

### COUNT IV:
### ASSAULT AND BATTERY, PURSUANT TO MISSOURI STATE LAW
### *As against Defendant Christopher Lee Jones*

127.     The allegations contained in all aforementioned Paragraphs are hereby realleged and incorporated as if fully set forth herein.

128.     Defendant Jones intentionally and unlawfully placed Ms. Demyers in fearful anticipation of harmful and offensive contact when he placed her in a holding cell without any other persons around and threatened her by stating, "[y]ou got yours, now where is mine.".

129.     Defendant Jones intentionally and unlawfully caused harmful and offensive contact of Ms. Demyers during a premeditated attack wherein he grabbed her breast and stuck his fingers in her vagina.

130.    All actions by Defendant Jones were undertaken during the course and scope of

his employment with Defendants St. Louis City and Glass.

131.    The actions of Defendant Jones were intentional, willful, wanton, and with

deliberate indifference to Plaintiff's rights, thus justifying an award of punitive

damages in an amount sufficient to punish Defendant Jones and/or deter him and

others similarly situated from such conduct in the future.

132.    As a direct and proximate result of the foregoing, Ms. Demyers suffered – and

continues to suffer – mental and psychological injuries, personal humiliation, pain

and suffering, emotional distress, and other related compensatory damages.

WHEREFORE, Plaintiff Toni Demyers prays this Honorable Court award

Plaintiff damages – compensatory, nominal, and/or punitive – in such an amount in

excess of $25,000.00 as is deemed fair and reasonable; for costs; for interest as allowed

by law; and for such other and further relief deemed just and proper.

## COUNT V:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, PURSUANT TO MISSOURI STATE LAW
### *As against Defendant Christopher Lee Jones*

133.    The allegations contained in all aforementioned Paragraphs are hereby realleged

and incorporated as if fully set forth herein.

134.    Defendant Jones acted intentionally and with extreme and outrageous conduct

when he undertook his premeditated sexual attack on Ms. Demyers.

135.    Defendant Jones's actions were so outrageous in character and extreme in degree

as to go beyond all possible bounds of decency.

136.    This extreme and outrageous conduct by Defendant Jones directly caused Ms.

Demyers to suffer from severe emotional distress.

137.    All actions by Defendant Jones were undertaken during the course and scope of

his employment with Defendants St. Louis City and Glass.

138.    The actions of Defendant Jones were intentional, willful, wanton, and with

deliberate indifference to Plaintiff's rights, thus justifying an award of punitive

damages in an amount sufficient to punish Defendant Jones and/or deter him and

others similarly situated from such conduct in the future.

139.    As a direct and proximate result of the foregoing, Ms. Demyers suffered – and

continues to suffer – mental and psychological injuries, personal humiliation, pain

and suffering, emotional distress, and other related compensatory damages.

WHEREFORE, Plaintiff Toni Demyers prays Honorable Court award Plaintiff

damages – compensatory, nominal, and/or punitive – in such an amount in excess of

$25,000.00 as is deemed fair and reasonable; for reasonable attorney's fees; for costs; for

interest as allowed by law; and for such other and further relief deemed just and proper.

### COUNT VI:
### FALSE IMPRISONMENT, PURSUANT TO MISSOURI STATE LAW
### *As against Defendant Christopher Lee Jones*

140.    The allegations contained in all aforementioned Paragraphs are hereby realleged

and incorporated as if fully set forth herein.

141.    Defendant Jones willfully and unlawfully detained Ms. Demyers without her

consent when he confined her to a private holding cell.

142.    At the time of confinement in the private holding cell, Ms. Demyers was aware

her freedom of movement had been restricted by Defendant Jones.

143.    All actions by Defendant Jones were undertaken during the course and scope of

his employment with Defendants St. Louis City and Glass.

22

144.    The actions of Defendant Jones were intentional, willful, wanton, and with deliberate indifference to Plaintiff's rights, thus justifying an award of punitive damages in an amount sufficient to punish Defendant Jones and/or deter him and others similarly situated from such conduct in the future.

145.    As a direct and proximate result of the foregoing, Ms. Demyers suffered – and continues to suffer – mental and psychological injuries, personal humiliation, pain and suffering, emotional distress, and other related compensatory damages.

WHEREFORE, Plaintiff Toni Demyers prays Honorable Court award Plaintiff damages – compensatory, nominal, and/or punitive – in such an amount in excess of $25,000.00 as is deemed fair and reasonable; for reasonable attorney's fees; for costs; for interest as allowed by law; and for such other and further relief deemed just and proper.

**KOLLER & MEADOR, LLC**

By:    _____

Nicholas K. Meador, #MO68769
1420 Strassner Dr.
St. Louis, MO 63144
Tel: (314) 962-1115
Fax: (314) 968-5030
Nick@KandMSTL.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically with the Clerk of the Court on this the 14th day of August, 2017.

Nicholas K. Meador



# SUFFERING IN SILENCE:
# HUMAN RIGHTS ABUSES IN ST. LOUIS
# CORRECTIONAL CENTERS

**ACLU**

AMERICAN CIVIL LIBERTIES UNION
of EASTERN MISSOURI

PLAINTIFF'S EXHIBIT

1a

tabbies



# Suffering in Silence:

# Human Rights Abuses in St. Louis Correctional Centers

A Preliminary Investigation of Civil Liberties Violations
at the St. Louis Justice Center
and the Medium Security Institution

Prepared by Redditt Hudson, Program Associate

American Civil Liberties Union of Eastern Missouri

Editor: John Chasnoff, Program Director

2009



# About the Author



**Redditt Hudson**

Redditt Hudson is the Program Associate for the ACLU-EM.  He joined the staff as a Racial Justice Associate in 2005.  In that role he led the Racial Justice Initiative for two years before being named the ACLU-EM Racial Justice Manager.

A former St. Louis police officer, Hudson left the force in 1999 to focus on addressing systemic problems in the criminal justice system, abuse of police authority, and improving the police/community relationship.  Seeking to address all of the fractures in the police/community relationship, in 2000 he co-founded Project PEACE, an organization that addressed issues of individual and community responsibility and accountability.   In addition to being a strong advocate for criminal justice reform, he also continues his work on immigrants' rights as well as serving on the ACLU-EM's Muslim Rights Task Force.  He sits on the U.S. Attorney's Hate Crimes Task Force in St. Louis.

He is a regular media commentator on criminal justice and racial justice issues. He has traveled the country speaking at statewide events, at national conferences for the ACLU, NAACP, offering legislative testimony, and keynoting other events focused on criminal justice and racial justice issues.

# Table of Contents

**Forward**………………………………………………………………………………1

**Introduction**………………………………………………………………….....2

**Findings**………………………………………………………………….....3

**Corrections Officers**………………………………………………….....5

**EMT Complaint Letters**………………………………………………28

**Inmates**………………………………………………………………32

**Impacts**…………………………………………………………….....40

**Conclusion**………………………………………………………….....42

**Correctional Center Policies**……………………………………46

     Use of Force………………………………………………………….....47

     Medical…………………………………………………………**56**

     Housing Unit Officer……………………………………………**65**

# Forward

One strong gauge of a society's level of civilization is how it treats women and children.  Now, with the terrible realities of Guantanamo exposed, it's easy to add prisoners to the list.  How we treat the people we incarcerate marks us as a culture, a society, as human beings.

Today, throughout America in prisons less scrutinized than Guantanamo, men and women are being abused— physically, sexually, verbally, and mentally.  They are being denied basic necessities like warmth, clothing, clean toilets, and medical attention.  Here in Missouri, the lion's share of complaint letters and calls to the ACLU are from prisoners; lately, more and more people walk into our office straight from short-term incarceration at the St. Louis Justice Center.  They are bewildered and exhausted and they are sad.  They have experienced the profound trauma of isolation at the mercy of some officials who routinely act on the notion that prisoners forfeit their human and constitutional rights.

*Suffering in Silence* is the result of the ACLU of Eastern Missouri's investigation into conditions at St. Louis' correctional facilities.  Through interviews with corrections officers and prisoners, Redditt Hudson has compiled a body of material that can serve as a guide to discovery for government officials aware or unaware of what goes on when they are not looking; it is a call for accountability by officials under whose watch the abuse occurs and who are obligated to repair a brutal, broken system.  And it is a challenge for all U. S. citizens to stand up and help reclaim America's credibility and moral standing in the world.

Brenda Jones
Executive Director
American Civil Liberties Union of Eastern Missouri
March 23, 2009

# Introduction

In 2007 the American Civil Liberties Union of Eastern Missouri (ACLU-EM) began an investigation of conditions inside the St. Louis City Justice Center and the Medium Security Institute (CJC/MSI). The investigation was prompted by allegations that Corrections Officers (COs) were abusing inmates inside the CJC/MSI. Various independent sources had notified the ACLU-EM that physical abuse of inmates, denial of due process to residents, and systemic, administrative facilitation of these abuses were part of the experience of many of the individuals processed into the CJC/MSI over the last three years.

The investigation began with interviews of four COs. Then all four were interviewed again. A fifth was interviewed at the CO's residence. A sixth CO walked into the ACLU-EM office and provided information after learning about the investigation from his colleagues.

Inmates gave interviews while in jail or are quoted from letters received by the ACLU-EM office.

The ACLU-EM realizes that this report is not exhaustive. At this stage, the ACLU-EM has neither the resources nor the authority to subpoena those involved and gather the necessary documentation. This preliminary investigation goes as far as the limits of our access allowed. The allegations herein can be corroborated by any institution with the power to compel information, particularly where immunity can be extended to cooperating persons. The ACLU-EM stands behind this document, believing that it is an important wake-up call, delivered by credible participants with long records of service to our community.

# Findings

The accounts and descriptions of conditions provided here by both the COs and inmates in this preliminary investigation lead to the conclusion that there is endemic abuse of inmates and a pattern of policy violations at the CJC/MSI. They describe conditions that warrant serious consideration of class action litigation, injunctive relief, outside intervention, and both civil liberties and human rights advocacy for the class and the individuals at the CJC/MSI.

According to those interviewed, human dignity is contemptuously disregarded, and civil liberties violations and physical abuse of residents are covered up regularly by officials at both facilities. The findings described in this preliminary investigation include:

- Inmate Assaults by COs

- Inmate Assaults on Other Inmates Directed by COs

- Systemic Cover Up of Incidents

- False Reporting

- Failure to Make Reports

- Superficial Accountability Process and Interference with Reporting  of Incidents

- Subjective Discipline and Rewards

- Sexual Harassment

- Sexual Misconduct

- Medical Neglect

- Squalor

- Overcrowding

- Extended Incarceration

- Inmates Stripped Naked and Subjected to Temperature Extremes

- Negligence Resulting in Death

- Intimidation

- Failure to Log and Report Medical Matters

- Questionable Hiring and Training

- Policy Violations

- Failed Oversight (Department of Public Safety)

The ACLU-EM would like to emphasize that the information given herein was provided despite an atmosphere of intimidation, retaliation, and cover up within the St. Louis Division of Corrections. Unless stated otherwise, the accounts of events and conditions inside the CJC/MSI were witnessed by those interviewed, and they have distinguished between what they have witnessed and what is known to them through their own efforts to gather information inside the CJC/MSI.

# Corrections Officers

**Corrections Officer 1 (CO 1)**

CO 1 wished to remain anonymous because of the atmosphere of intimidation and retaliation in the CJC/MSI. CO 1 has been a Corrections Officer for many years. S/he was the first CO interviewed for this preliminary investigation. S/he has provided both eyewitness accounts of systemic abuse at CJC/MSI, and documentation of his/her efforts to address these abuses through mandated procedures. The ACLU-EM interviewed CO 1 four times. His/her accounts are consistent and credible, beginning with his descriptions of the physical environment inside the CJC.

<u>Inadequate Conditions</u>

CO 1 states that overcrowding at the CJC is so severe that inmates are regularly forced to sleep under beds and toilets. CO 1 alleges that mats and steel inside the facility are not regularly sanitized; vomit and human feces are sometimes found on surfaces in areas where inmates are housed. Staph infection is an ever present health risk inside the facility, and outbreaks of staph and other communicable diseases have been an ongoing problem.

CO 1 made numerous attempts to address these conditions. S/he tried to advise Eugene Stubblefield, Superintendent of the Division of Corrections, about these violations and was denied the chance to meet with him. CO 1 saw sporadic attempts to address or improve the conditions inside the facility, but lack of sanitation remains an issue on many of the surfaces with which inmates come into contact.

<u>Retaliation/Inaction</u>

CO 1 reports that attempts to address this or any other issues relative to policy adherence or the civil liberties and human rights of the inmates in either facility are met with retaliation against whistleblowers by administrators and their cohorts among the COs. For example, an administrator will move an out-of-favor CO to work in an area of the facility where he/she is not familiar; this can pose a serious risk to safety. Arbitrary enforcement of disciplinary policies is another type of retaliation. The penalty leveled against a CO for a rule infraction largely depends on who the CO is and his/her relationship with CJC/MSI administrators. CO 1 states that in some cases, particular COs who follow policy, and/or recognize inmates' rights, are pressured to resign or are terminated as the result of concerted efforts made by administrators and other COs. Superior officers will create a paper trail that negatively impacts that particular CO.

<u>Physical Abuse</u>

CO 1 states that there is violent physical abuse and beating of inmates inside CJC/MSI. One case highlighted by CO 1 involves a young man (16 at the time of the incident, a juvenile) who was violently assaulted by a CO while inside the Medium Security Institute. On February 15, 2007, first shift Corrections Officers entered the cell occupied by juvenile D.S. in Housing Unit 4, stomped and punched him, and kicked him in the face, according to D.S. Both CO 1 and CO 2, described below, report that the victim's injuries were consistent with his allegations. At the time of the assault D.S. was about 5'5" and weighed 13O lbs. At approximately 3:35 a.m. CO 1 answered a radio call summoning him to D.S.'s cell. When s/he arrived s/he observed the badly bruised and lacerated eye of the juvenile.

Up to that point no written report had been made to record that the incident had even taken place,

and when CO 1 was verbally briefed on the evening of February 1, 2007, no mention of the incident was made.  CO 1 took photographs of the injured juvenile. CO 1 summoned CO 2 to D.S.'s cell to watch him process the incident. Within the facility, CO 1 was known to adhere to policy and require that those s/he supervised adhere to policy, especially use of force. CO 1 cites the initial failure to make any written or verbal report of this serious incident to Major Russell Brown, Chief of Security, as a clear departure from policy and procedure.

Inaction

More importantly, the administrative response to the assault of this juvenile by the COs was to take no action against the officers who assaulted him., Rather, they focused their attention on why CO 1 took the picture of D.S. to begin with (questioning his/her intent to make a record of it at all) and why s/he did not properly 'secure' the photograph after taking it. (CO 1 thought s/he put the picture in a file drawer, but had left it out and someone saw it).

False Reporting

CO 1 alleges that the day after the COs assaulted D.S. a false report was produced. Lt. Sydney Turner directed the COs involved not to write individual reports of the incident. Policy and procedures dictate the opposite—that each should make his/her own accounting of events. Lt. Turner then wrote out a report for each CO individually and had each one sign the report she had written as if s/he had written it himself. Facts had been changed and/or omitted in the reports written by Lt. Turner, whom D.S. reported as being present for the assault.

CO 1 reports another example of false reporting. During a similar incident on February 23, 2006, CO 1 observed Samuel Aye, bleeding and handcuffed inside the CJC at approximately 3:00 a.m. CO 1 had not been notified in writing or verbally of any incident involving a CO using force

against a detained person. CO 1 submitted an Employee Action Report in which s/he presented the following information:  *"On Thursday, February 23, 2006, at approximately 3:00 a.m.., I arrived on the 2"floor, Sheriff side…when I observed detainee Samuel Aye standing in the window and crying out from the female holdover tank.  Mr. Aye was in street clothes and appeared to be bleeding on the left side of his face with his hands cuffed behind his back as he pleaded to be freed from the restraints. Additionally there was no officer present in the area... 1 requested via radio for Lt. Lorez Williams to report to the Sheriff's holdover which [sic] she arrived moments later. I asked her what was going on and she stated that she did not have any knowledge of Mr. Aye's situation. Lt. Williams and I began questioning Mr. Aye as to how he sustained the injury above his eye. However, he continued to cry out in distress about being handcuffed too tight.  Lt. Victor Cooper arrived and I asked him what happened with Mr. Aye. He stated that he wasn't sure and that officer Djuan Brock had brought Mr. Aye to the Sheriff's holdover and that Nurse Foster had looked at him earlier and stated that he was fine. Mr. Ken Austin, L.P.N., and Ms. Kelly Morgan, RN, arrived and examined Mr. Aye, then recommended he be brought to Medical for additional treatment to a deep laceration that was above and across the corner of his left eye. Lt. Cooper failed to notify me that force had been used, nor was it apparent that he had sought medical attention for detainee Aye. Lt. Cooper also had Mr. Aye confined in a secluded area without adequate supervision. In addition, he failed to insure that I was provided complete documentation on the use of force prior to exiting the building at the conclusion of his tour."*

Problem Unit

On April 26, 2008, 49 year old Michael Stevens was murdered in his cell at CJC, allegedly by

his cellmate Robert Francis. Stevens was murdered in the same unit on the second floor where, less than a year earlier, the 29 year old inmate had been dead so long that he had rigor mortis by the time COs finally checked on his condition. It is also the same floor where inmate Samuel Aye was beaten and left unsupervised and without medical treatment.

In a St. Louis Post-Dispatch article dated April 28, 2008, Director of Public Safety Charles Bryson stated, in response to the incident, that he was going to meet with corrections workers and others for a debriefing. He said corrections officers can hear everything that is going on, and make rounds for visual updates looking into each cell as they walk past. He noted that cameras are also used to monitor activity.

On April 27, 2008, CO 1 wrote an email to the ACLU-EM regarding the death of this inmate. S/he reiterated what s/he had said before: "This area of the CJC is grossly mismanaged...Mr. Stubblefield and his team of managers have not been responsible to the needs of the citizens of this city and should be held accountable for such."

Sexual Misconduct

CO 1 notified the ACLU-EM in February 2009 that a male CO at the CJC was discovered to have had sexual contact with a female inmate at the CJC on multiple occasions. The original CO involved in this misconduct has been charged, and an investigation is ongoing. CO 1 expressed a concern that several more officers were involved in the wrongdoing. CO 5 has corroborated this information.


**C0 2**

*"Oh Lord have mercy — please let this child go home!"*

CO 2 wished to remain anonymous because of the atmosphere of intimidation and retaliation in the MSI. CO 2 has been a Corrections Officer for a number of years. The ACLU-EM interviewed CO 2 once by telephone and twice at his/her residence. CO 2 has expressed serious concerns about the conditions s/he has observed inside the MSI.

<u>Physical Abuse</u>

The statement quoted above, made by CO 2 during one of the interview*s*, was an expression of his/her feelings regarding a young female inmate at the MSI, Peggy Jones. CO 2 observed resident Peggy Jones being brutally beaten by Captain Irene Mitchell, repeatedly and without cause, over a period of weeks in 2007. "I got tired of looking at it" CO 2 said. CO 2 witnessed Captain Mitchell enter Jones' cell several different times to savagely attack her. CO 2 stated that inmate Jones would cry out and plead for it to end but Captain Mitchell would continue to beat her without mercy. "She beat this child until it was pathetic," said CO 2. Even the act of recalling these events seemed to pain him/her deeply. So too did some of the other treatment of inmates s/he described to the ACLU-EM. CO 2 stated that residents in the MSI commonly had their clothes taken from them and were then put on bare floors completely naked in frigid cells during the winter months while COs wore sweaters or wrapped blankets around themselves.

<u>Inappropriate Incentives</u>

CO 2 stated that a culture of abuse is encouraged inside the MSI and those COs who adapt themselves to it and embrace the systemic cover up of the abuse are advantaged with promotions or other favors from administrators. S/he alleged, for example, that cooperative COs were given days off or given drug test alerts prior to 'random' drug testing. CO 2 states that anyone advocating policy adherence in the MSI is fired by Captain Mitchell. S/he describes a clique

revolving around Lt. Sidney Turner, Lt. Bettye Love, and Lt. Willie McMorris that "beats people up, covers it up, and they will get you fired."

<u>Physical Abuse</u>

CO 2 witnessed another attack inside the MSI which s/he described as a ruthless, cruel assault of several inmates in the A-O dorm by fifteen COs who had been ordered by Captain Mitchell to "crack their mf-ing heads open." The COs, as ordered, entered the A-O dorm and violently struck the inmates' heads and bodies repeatedly with their billy clubs, punched, and kicked them. The reason the assault was ordered by Mitchell? An inmate asked a CO a question which the CO didn't want to answer. The inmate repeated the question - which upset the CO. That was when the order was given to "crack their mf-ing heads open." Clearly the assault on these inmates and the attacks on inmate Jones are examples of the Use of Force Policy being violated. Strikes to the head are considered deadly force in the Use of Force policy of the Department of Corrections, as in many law enforcement agencies around the country.

CO 2 was also aware of the incident involving the violent assault of then *5' 5"*, 130 lb. juvenile D.S., alluded to above by CO 1. CO 2 was summoned by CO 1 to the cell in which D.S. was being held. CO 1 wanted CO 2 to witness him process the incident. When s/he arrived s/he observed D.S. in the cell with a laceration over his left eye and swelling in his face. Later in the medical unit s/he would observe bruising around his torso. Inmate D.S. reported to CO 2 that he was assaulted by Lt. McMorris after D.S. made a joke about a CO.

A relative of D.S placed a call to the ACLU-EM in June 2008, informing the organization that D.S. had since been moved from MSI to CJC and was complaining that inmates inside the CJC

were allowed by COs to enter cells for the purpose of assaulting other inmates almost every night.

CO 2 has also observed CO Dirrell Alexander assault an inmate who was already handcuffed, choking him and slamming him over a stairwell.

CO 2 states that COs will allow or direct inmates to assault other inmates. "Captain Mitchell has authorized COs to beat a small inmate--beat him!" "They beat him down!" said CO 2. She states that many other inmates have been assaulted and that COs there have "gotten away with so much dirt." CO 2 states that a CO was merely suspended for getting McDonald's food as a reward for inmates who assaulted another inmate for him.

Sexual Misconduct/Inaction

CO 2 also asserts that there are issues at MSI involving sexual harassment and misconduct by COs inside the facility. S/he states that sexual harassment of female COs by male COs is common. COs also engage in harassment of inmates and misconduct with them as well. "Female COs go after young inmates (sexually), and male COs go after female inmates with coercion." S/he told the ACLU-EM that one CO had been written up for sexual misconduct seven or eight times but nothing had been done about him beyond the write-ups.

Physical Abuse

CO 2 states that currently the concept of "care and custody doesn't exist" inside the Medium Security Institution. "It's just control." That sentiment was echoed by every CO interviewed for this report.

The absence of a care and custody approach can have deadly consequences for citizens serving time in the CJC/MSI. As related by CO 2, Joshua Turner, a 19 year old inmate who had been

housed inside the MSI, committed suicide after going three days without supervision over the 2008 Dr. King holiday weekend. After it had been determined that he was a risk to himself, Mr. Turner had been placed in Pod 3 and left there in regular inmate housing, instead of Pod 4 for observation as directed by medical staff. No one watched the 19 year old for three days. Some time after Mr. Turner's death, CO 2 would hear CO Sylvester McMillan say mockingly "What suicide? That's a figment of your imagination," when the subject of Turner's death came up.

In another incident involving the death of an inmate at the MSI, CO 2 told the ACLU-EM that a white inmate died after he sharply struck his head on something, asked for medical attention, and was just given a little water by medical staff and told to walk back to his bunk. "By the time he got to his bunk he died," states CO 2. That inmate's death is also referenced below by CO 3.

<u>Medical Inattention</u>

In a similar case, local CBS affiliate KMOV Newschannel  4 ran an investigative report on the MSI showing an inmate there who attempted to get medical treatment after he struck his head in the shower. He was not given adequate treatment, and ultimately lost his hearing completely.

When speaking of medical care at MSI, CO 2 states that nurses are generally slow to respond to inmates who are sick or injured. In one case s/he observed a nurse's slow response to an inmate who complained that he didn't feel well and couldn't get up. The inmate went into a seizure and the nurse just let him sleep it off. "That kind of thing happens all the time," s/he states. CO 2 went on to describe a sadistic practice by MSI staff that regularly takes place in the medical dorm. For inmates in that area, required medicine is dispensed at a set time. CO 2 states that if an inmate cannot physically make it to the distribution point at the correct time, they are *not* given their medicine. This is true even for heart patients. It doesn't matter if the inmate is slow to move

due to infirmity or feebleness. An inmate asking for his medicine after struggling to get up and arriving at his door once the medical staff has passed it with the medicine is told, "No, you didn't make it." This is a clear violation of jail policy and federal law regarding disabilities.

## False/Incomplete Reporting

CO 2 also describes a work environment at MSI where false reporting of incidents, non-reporting of incidents, and cover-up is pervasive. CO 2 states, for example, "Videotapes from the cameras inside the MSI are supposed to be preserved for 90 days. Usually when a serious allegation of misconduct is made and there should be videotape of the incident, the investigation is initiated 100 days after the alleged incident. Thus perpetrators circumvent the 90 day preservation; the videotape film is gone or lost."

## Drug Trafficking/Inaction

State and federal drug law is also violated by COs in the MSI. CO 2 describes CO involvement with the transport of contraband, including illicit drugs, into the MSI, and s/he has observed transport of drugs (crack cocaine) to inmates in exchange for use by COs. CO 2 alleges that some COs have been suspended multiple times for drug use and "some of them were sent for treatment by the city but they came back doing the same thing." "You know who they are [COs transporting drugs]…Nothing is done about it." This allegation gives added weight to the assertion that one of the rewards afforded to COs who help cover the corruption at CJC/MSI is advance notice about upcoming 'random' drug tests for staff.

## Inadequate Conditions

CO 2 cites filth and disease as another major problem in the MSI. "Staph infection is everywhere." Corroborating CO 1 above, s/he has observed inmates living in environments

where vomit and human feces are on exposed surfaces. Rarely are the mats and steel cleaned or disinfected.


**C0 3**

CO 3 wishes to remain anonymous due to the atmosphere of intimidation and retaliation inside the MSI. S/he has been in the field of corrections for a number of years. CO 3 was interviewed twice by the ACLU-EM. CO 3 describes an environment consistent with other reports in this preliminary investigation--rife with violence, coercion, corruption, and retaliation.

<u>Physical Abuse/False Reporting</u>

CO 3 states, "I saw a guy (an inmate) in handcuffs where a Lieutenant banged that guy's head into the bars." The Lieutenant s/he observed was Lt. McMorris, who was also named in the violent assault of juvenile D.S., and is named below relative to an incident involving a suicidal inmate named Crystal Randle. CO 3 continued, "Nothing happened to the Lieutenant." "And to cover that Lieutenant's ass they went to the extent of filing charges on that guy, saying that he assaulted the officer." This cover-up created a further criminal record for the inmate and likely extended his incarceration period.

CO 3 goes on to describe another incident involving the assault of an inmate by a CO at the MSI. "An inmate was taken to an isolated area (by the CO) and the CO took a soap dispenser and busted his head." The alleged assailant, CO Paul Tillery, is still employed, though transferred to the CJC.

In fact, CO 3 says that supervisors are criticized (CO 1 for example) when they call for restraint once an inmate has stopped offering resistance in a physical altercation with COs. CO 3 has

heard statements made in situations like that such as, "You ain't shit. You wouldn't even let us beat the shit out of him." "But it's not about that," CO 3 says, "you have detained him. He's under control. It's over." It is policy in the Division of Corrections for COs to cease the use of physical force once an inmate has been detained.

"A *lot* of those guys (inmates) down there are being degraded by COs and supervisors," says CO 3. Asked why COs do these things, CO 3 responds, "Society says they are inmates, they're nothing--or they're criminals." Or, regarding other possible motives of some COs who assault inmates, CO 3 speculates, "Maybe you got picked on growing up in life. Now you've got somebody to look down on who has to do what you tell them to do."

Moreover, CO 3 states, "COs can't say anything about it [inmate abuse] either, because of retaliation from supervisors." CO 3 said "I've seen them mess with them [COs who are following policy], find things to write them up about.., suspend them and try to demote them." "It's a code."

CO 3 states that once "a CO that was in her 60's was put on one of the worst dorms there" as retaliation for protesting treatment of inmates. "A lot of people won't speak up."

CO 3 states that COs also coerce inmates into attacking or "jumping on" other inmates. "It goes on a lot", "and when I say 'jump on', most of the time it's pretty bad." "There was a situation where nine guys [inmates] jumped on one guy [another inmate]." The inmate that was assaulted by the other nine "stated that a white shirt [supervisor] had him jumped on." CO 3 said another time "a young white guy said a CO was going to have him jumped on and checked himself out of the dorm because he feared the CO and feared for his safety." Sometimes inmates are violently assaulted because of the intentional inaction of a CO. CO 3 states that at times "Inmates get

jumped and a CO will stand there and look." It is another way for them to use their position to help or hurt an inmate. In one case that CO 3 describes, "a guy was stabbed up because no one was watching. The guard was mad with him and wouldn't watch."

<u>Drug Trafficking</u>

There are other problems with CO misconduct that are not limited to inmate rights violations. COs interviewed for this summary disclosed that there is little security provided at the MSI to discourage those COs who are involved in bringing illicit drugs, in violation of both state and federal law, to inmates inside the MSI. CO 3 states, "Security on that is terrible." Inmates are "steadily getting cigarettes and drugs. Sometimes it smells like a lounge…Down there [MSI], you have well known mules; a mule is a person that brings in cigarettes and drugs to the inmates…Everybody pretty much knows who the mules are but there is so much favoritism, subjective discipline." CO 3 also witnessed COs bringing in illicit drugs. "But you are jeopardizing everybody's safety when you allow that kind of activity," says CO 3. S/he states that in one instance they "found large quantities of marijuana and tar (black tar heroin) in the facility." There was no investigation or official action on record regarding the incident, and "no one was reprimanded."

<u>Medical Inattention</u>

CO 3 references the deaths of inmates in the CJC/MSI. At the MSI, CO 3 states, "A white guy [the same inmate referenced above by CO 2] said, 'I need to go to medical.'  At some point he fell, they tried to say he was faking but they finally took him to medical. He came back from a cursory visit with medical and within twenty minutes the man was dead. He died in his 'boat' [a mattress on the floor]."

CO 3 also describes the death of an inmate at the CJC that occurred around the same time period as LaVonda Kimble's death. It involved a 29 year old male inmate who was put in a cell rather than taken for medical attention after he vomited repeatedly. "Instead of taking him to medical they threw him in another holding cell all by himself— after he kept throwing up. Nobody checked on him." When he was finally discovered dead in that cell, rigor mortis had set in. The ACLU-EM was also notified of the death of this 29 year old inmate by then St. Louis Fire Department Chief Sherman George, after medical personnel informed him of the incident.


## C0 4

CO 4 wished to remain anonymous because of the atmosphere of intimidation and retaliation in the MSI. CO 4 has been a Corrections Officer for many years.  S/he is currently employed as a CO at the MSI. S/he was interviewed twice by the ACLU-EM. S/he describes the MSI as a place where systemic abuse is sustained by inappropriate rewards and retaliation.

<u>Inappropriate Incentives/Retaliation</u>

CO 4 provides eyewitness accounts of abuses inside the MSI. S/he describes the MSI as a place where policy is violated regularly, a situation aggravated by the fact that subordinate COs have been given authority over him/her and other superiors in the MSI as a result of their willingness to adapt to and promote the culture of abuse and cover-up there.

As stated by CO 4, Lts. Turner and Elam are COs of lesser rank than him/her and had participated in policy violations. They were shielded from repercussion by Acting Deputy Superintendent (ADS) Reginald Moore and Superintendent Stubblefield, and had been authorized in writing by Superintendent Stubblefield to issue directives to their superiors. CO 4

believes that this authority was undoubtedly a result of their willingness to cover the corruption and the abuses that Superintendent Stubblefield and others have allowed to exist in the CJC/MSI. Authorizing subordinates, these subordinates in particular, to issue directives to their superiors is an example of the reward and retaliation ethic that defines the culture inside CJC/MSI. CO 4 describes a situation alleged by the other COs--that corrections officers who won't embrace the abusive culture that has become entrenched at the facility "are being forced out or penalized for challenging its supporters."

S/he also believes that forcing those challengers out achieves the goal of further entrenching the culture of abuse by staffing CJC/MSI almost entirely with COs who will go along with the abuse and cover-ups. Rather than attempt to address legitimate issues relative to abuse or ignored policies, CJC/MSI administrators are actively engaged in ratcheting up activity involving what are already abhorrent transgressions against civil liberties and common morality. "They don't investigate use of force, they don't use the videos, there is no interview, now that CO 1 is gone." says CO 4.

At the time of this interview with CO 4, CO 1, notorious at CJC/MSI for his/her insistence on policy adherence and recognizing inmates' rights, had been terminated after an investigation of a complaint against him/her relative to CO 1's secondary employment. S/he calls one charge a minor technical oversight and claims the other charge was untrue. It is important to note that CO 1's original statements to the ACLU-EM were made before his/her termination.

CO 4 believes CO 1 was dismissed in retaliation for his/her track record of respect for inmates' rights and his/her adherence to policy.

CO 4 had his/her salary cut by 3% almost immediately after s/he wrote up Lt. Turner for leaving

female inmates in a medical unit unsupervised. As a Captain, CO 4 was within his/her authority and had acted according to policy in reporting that incident.


## C0 5

CO 5 wished to remain anonymous because of the atmosphere of intimidation and retaliation in the CJC/MSI. CO 5 has been a Corrections Officer for many years. His/her performance record indicates that s/he is an exemplary CO.  S/he is currently employed as a CO in the MSI/CJC. CO 5 was interviewed twice by the ACLU-EM.

Overcrowding

CO 5 reports that overcrowding is a persistent problem, unsolved up to the present. S/he states that the administration's recent move to open up space for 450 new beds did nothing to relieve this overcrowding. CO 5 reports single bed spaces turned into bunks, the placement of mattresses in the gymnasium, and the consistent filling of both facilities beyond their designated capacity.

Sexual Misconduct

For this preliminary investigation CO 5 provided eyewitness accounts of systemic abuses inside the MSI. In one case, s/he has seen videotape evidence of excessive force used by Lt. Turner against inmate Crystal Randle, involving three separate incidents.

In each instance inmate Randle required medical attention. CO 5 claimed that the abuse was escalating at the time of his/her interview. Lt. Turner had Randle spend as many as fifteen days completely nude in a cell on her orders. Medical staff stated to COs that inmate Randle had to have at least a gown to wear, and on CO 5's shifts the COs complied and made sure Randle had at least that. When the first shift came on Lt. Turner ordered the young woman stripped again

and left Randle naked in her cell. CO *5* says that Major Brown investigated the incidents involving use of force, and found nine violations of policy when he reviewed the videotapes of these incidents [apparently a rare case of videotape preservation]. Major Brown made an Employee Action Report of the incidents and included his findings regarding violated policies.

False Reporting

It should be noted here that according to each of the COs interviewed for this preliminary investigation, Major Brown has voluminous, almost encyclopedic documentation of years of violations in the MSI and maintains that documentation. He would be an excellent resource, someone to whom some legal protections or immunities could be extended, and would likely produce accounts of many more violations.

When Major Brown submitted his report and findings regarding each incident to ADS Moore, his supervisor at MSI, and Superintendent Stubblefield, the reports were sent back to him by both men for revision because they were "too detailed," according to CO 5. Lt. Turner's name and involvement appeared in Major Brown's original Employee Action Report relative to policy violations, particularly excessive force, *in too much detail,* according to ADS Moore and Superintendent Stubblefield.

What is presumably the revised Employee Action Report submitted by Major Brown was provided to the ACLU-EM. While Lt. Turner's role is reportedly reduced in it, and the role of Lt. Bettye Love is amplified, it is still a damning assessment of inmate Randle's treatment. The salient parts of Major Brown's revised report are in the conclusions he draws on three separate incidents involving assaults by COs on inmate Randle occurring on April 9, 2008. The narrative of his revised report reveals a man who is serious in his attempt to maintain some integrity, both

in the process for reviewing the conduct of his colleagues and in the institution itself. He relates the story of a suicidal inmate, who in her desperation defies further abuse from the COs, and in so doing creates the conditions for the ensuing confrontations in which she is further abused.

Brown writes in his narrative that the videotapes of the first two incidents were captured on the MSI--CCTV/Security Camera--Computer Digital Video Recording System.  By design, that system only captures the portion of these incidents which took place in the common area in Pod #1. The third use of force incident was videotaped with a hand held camera as per procedure and policy. As a result there was *no* videotape evidence (emphasis Brown's) recorded in the first two incidents regarding what officers did to Randall in her cell when they initiated a cell extraction/use of force incident, and Major Brown states plainly that Lt. Love failed to ensure that the use of force incident was captured on video cassette tape with the hand held video camera Re: Incident 1, 7:35 am. Major Brown's investigation led him to the following conclusions: "Lt. Love failed to follow established guidelines as cited in the Division of Correction Policy and Procedures 3.1.7—Inmate Movement—3.1.27—Cell Extractions and 3.1.21—Use of Force. Lt. Love also did not adhere to the established Division of Correction Policies 3.1.10—Incident Report Form and 3.1.30 —Incident Reporting, when she did not ensure that officers provided complete and accurate documented Use of Force Reports and Incident reports, as well as supervisors' reports."

The second encounter between the COs and inmate Randle took place at 8:35 a.m. on the same day.  In the narrative of his Employee Action Report regarding this incident Major Brown writes that Lt. Love made a decision to summon a male team of COs to inmate Randle's cell for additional back up. Lt. Willie McMorris and two male correctional officers responded and were directed

to place inmate Randle in a restraint chair. Major Brown writes that, based on the information that was available, it is apparent that this incident was not clearly and concisely documented by the male officers and supervisor, and that there are no witness reports of this incident.  Finally, there is no video evidence of this incident during which the male officers secured the combative female inmate in a restraint chair to be transported. After investigating the second incident Major Brown concludes: "Re: Incident 2, 8:35 am......Acting Shift Commander Lt. Love did not adhere to the Division of Correction Policy 4.2.13—Suicide Prevention/Intervention and summon the medical department's mental health professional to Pod #1. Lt. Love failed to follow the established guidelines as cited in Division of Correction Policy and Procedures 3.1.10 — Cell Extractions, 3.1.24—Restraint Chair and 3.1.21—Use of Force. Because Lt. Love did not ensure that the officers provided complete and accurate documented Use of Force Reports and Incident Reports, as well as supervisor's reports for the incident, she is also in violation for failure to adhere to policies 3.1.10—Incident Report Form and 3.1.30—Incident Reporting."

<u>Sexual Misconduct/Non-Reporting</u>

The third incident involved inmate Randle openly threatening suicide. Major Brown writes that Lt. Love and a CMS Mental Health Professional were called for the emergency situation. The officers who called for Lt. Love and the CMS Mental Health Professional reported that inmate Randle had torn up her suicide gown and made a noose which she tied around her neck and threatened to hang herself. Major Brown continues, Lt. Love determined that inmate Randle needed to be placed in a restraint chair, and had CO Evone Lester serve as the video camera operator. This video is the one seen by CO 5, upon which s/he bases his claims of excessive force in this incident. The videotape started, revealing CO McMorris entering inmate Randle's cell to get

her cooperation to be moved to the medical department, but she was completely naked [emphasis Brown's]! Brown writes that the officers took approximately 8 to 10 minutes to place the restraints on inmate Randle. Upon completion of restraining inmate Randle to the chair, it is simply turned toward the open cell door, clearly exposing the inmate's nudity. Inmate Randle remained exposed for 2 minutes until a medical gown was placed over her body. CO 5 reports that Inmate Randle's exposure was both prolonged and unnecessary.

Major Brown concludes: "Re: Incident 3, 10:50 am....Lt. Love allowed the inmate to be humiliated as well as allowed Lt. Willie McMorris and the other two male officers to perform inappropriate and unprofessional actions. As a result, Lt. Love did not adhere to the Division of Correction Policy 4.2.13--Suicide Prevention/Intervention, 3.1.27--Cell Extractions, 3.1.24-- Restraint Chair and 3.1.21--Use of Force. Lt. Love also did not adhere to policies 3.1.10--Incident Report Form and 3.1.30--Incident Reporting, when she did not ensure that officers provided complete and accurate documented Use of Force Reports and Incident Reports, as well as supervisor's reports for the aforementioned incident. As a result of Lt. Bettye Love's behavior and decisions I am recommending that she be scheduled for a pre-disciplinary hearing."

The anonymous individual who provided the ACLU-EM with Major Brown's report stated that to date neither Lt. Love nor anyone else has been disciplined regarding inmate Randle. CO 5 points out that the first two incidents were not taped so there is no record of the brutally excessive force that was used, and that Lt. Turner has also assaulted other inmates. As Major Brown reports, there were also no accurate written records of the incidents.

Inappropriate Incentives

CO 5 also revisits the reward/retaliation dynamics of the CJC/MSI. In the weeks prior to these

assaults on inmate Crystal Randle by Lt. Turner and the other CO's, there was a list for lieutenants of those eligible to be promoted to captain. During that time, CO 5 had gone to the Missouri Human Rights Commission with a complaint that administrators were going to let the list lapse. Policies allow authorities to let the list expire after two years and create a new list. They then planned to promote Lt. Turner, an insider and preserver of the abuse and cover-up culture, to the rank of Captain.

Note CO 4's earlier account of administrators taking the extraordinary step of vesting authority in Lt. Turner over her superiors prior to this time. In another earlier show of favoritism, administrators had ordered changes protecting Lt. Turner in Major Brown's original reports describing the incidents with inmate Crystal Randle.

In this instance, the promotion list was allowed to lapse, and a new list was created with Lt. Turner's name at the very top of it—just as CO 5 had stated it would happen to the Missouri Human Rights Commission. Now Lt. Turner could legitimately be placed in a supervisory role, and be better positioned to shape outcomes. Subsequent efforts by CO 5 prevented that promotion. Nevertheless, this incident speaks directly to the reward/retaliation dynamic described by each of the COs interviewed for this report. In contrast to the favor showed to Lt. Turner in the aftermath of several violations, CO 5 states that Major Brown was increasingly at odds with ADS Moore and Superintendent Stubblefield, with many of his actions relative to the internal operation of the MSI coming under the intense scrutiny of ADS Moore and Superintendent Stubblefield and often challenged by them. CO 5 believes that Major Brown is now being pressured to leave MSI because of his insistence on actual policy adherence there. It is noteworthy that CO 5 had to go to the Human Rights Commission with his/her complaint. After

his/her many years of service, s/he evidently knew that the internal systems for recourse were not functioning legitimately.

## CO 6

CO 6 wished to remain anonymous because of the atmosphere of intimidation and retaliation in the MSI. CO 6 has been a Corrections Officer for many years, and is currently employed at the CJC/MSI. S/he was interviewed once at the office of the ACLU-EM.  CO 6 provided information regarding training and policy.

<u>Inadequate Training</u>

In the interview s/he insists that training for CJC/MSI personnel is and has been dangerously substandard for years. CO 6 states that in fact, much of the staff at CJC/MSI hasn't been trained properly in five years on direct supervision, interpersonal communication skills, firearms, first aid and CPR. This statement is in line with the EMT account described below that CJC staff compressed LaVonda Kimble's stomach instead of her chest when she was in cardiac arrest and were puzzled when asked if they had used a defibrillator to try and resuscitate her. There has been no training beyond just passing out written policy to staff and leaving them with it. CO 6 knows the requirements for training of corrections officers. S/he is a former training supervisor for CJC/MSI COs. S/he was certified to do so by the National Institute of Corrections (NIC), and states that s/he helped to write some of the staff policy for CJC/MSI. CO 6 states that what COs currently receive in the area of training "is not training as

required by the U.S. Justice Department or the NIC." CO 6 states that s/he has notified Superintendent Stubblefield that CJC/MSI staff is under-trained, with no response from Superintendent Stubblefield. Further, CO 6 states there are "no accurate records of testing proficiency." CO 6 says s/he "got out of training because it was a neglected aspect of the necessary functions of CJC/MSI – it became sub par." CO 6 believes that an institutional disregard for policy and a deficient understanding of policy by staff and COs at CJC/MSI has resulted in frequent policy violations. The institutional disregard for policy *becomes* policy according to CO 6. S/he said "When policy violation becomes acceptable practice--it becomes part of standard operating procedure." Policy violations and the resulting rights violations they produce, according to CO 6, are standard operating procedure at CJC/MSI.

<u>Sexual Misconduct</u>

CO 6 also corroborates the account of inmate Crystal Randle's abuse which CO 5 describes above. S/he also knew of one other instance in which she was left naked in her cell and then put in a restraining chair by a male CO in violation of policy.

# EMT Complaint Letters

A letter from St. Louis Emergency Medical Technician (EMT) Christine Seper to former St. Louis Fire Department Chief Sherman George provides another revealing example of the atmosphere of intimidation and cover-up that surrounds workers who attempt to recognize inmates' rights in the CJC/MSI. The letter describes events surrounding the death of LaVonda Kimble, who is already mentioned in this preliminary investigation, and the environment inside CJC. According to the St. Louis Post Dispatch in an article dated June 7, 2007, Christine Seper and Chastity Girolami were the EMTs who responded to the CJC when LaVonda Kimble suffered an asthma attack there April 11, 2007.

<u>Medical Inattention</u>

The Post-Dispatch reported that LaVonda Kimble died at St. Louis University Hospital an hour after the EMTs were delayed in seeing Kimble when they tried to enter the CJC. Subsequently CJC staff interfered with them as they desperately tried to save Kimble's life. Kimble, a thirty year old single mother of a twelve year old, had suffered an asthma attack inside the CJC and time was of the essence in treating her.

The incident was heavily covered by St. Louis print and electronic media.

The Post-Dispatch wrote; "A delay in letting paramedics into the city jail and 'substandard' emergency care by staff there may have doomed an inmate who suffered an asthma attack, according to a blistering report by the fire department." It should be noted that the term "inmate" in the Post-Dispatch article describes a woman, LaVonda Kimble, who had been

arrested only hours earlier by St. Louis police for a simple traffic warrant, for which her boyfriend had already posted bond. The release order that was issued when he posted her bond went to the wrong jail; she was erroneously detained at the CJC, and her very limited exposure to the culture of neglect, abuse, intimidation and cover-up inside the CJC/MSI proved deadly. Kimble had been inside the CJC for about eight hours. "The initial delay was detrimental to the patient's outcome," EMT Girolami writes in her report, which was made public and was presented in the media. She describes the time they lost just trying to gain entry to the CJC after they had been summoned there. Girolami says that firefighters who had arrived ahead of the EMTs told her that when they got there CJC staff was trying to perform CPR by compressing Kimble's stomach instead of her chest. Girolami further notes that when medics asked a nurse if she had used an automatic defibrillator to try to restore Kimble's heartbeat, "She just looked at us and asked us what we were talking about." The jail care was "substandard at best" Girolami writes. Her considered, professional opinion that care inside the CJC is at best substandard is consistent with the observations of the COs and inmates interviewed for this preliminary investigation.

Girolami also writes that a CO distracted them with questions about their ID numbers, questioning them likely as a result of the EMTs having expressed concern, as they finally gained entry, about the delay in allowing them to treat Kimble, and dismay regarding some of the treatment that had been provided to Kimble by CJC nurses prior to the EMTs' treatment. Now angered, the CO wanted to know who they were. This was going on while they were struggling to save Kimble's life. The medics twice asked the CO to "back off" "She kept persisting and finally my partner informed the staff that this patient was in cardiac arrest and basically dying, and they would have to wait." writes Girolami. "The staff was surprised at this. They didn't know the patient was in

cardiac arrest". Girolami complains, "Every time I've been to the Justice Center, it takes 10 to 15 minutes to even get to the patient. There is never anyone to guide us and never any sense of urgency."

Again, that is a statement made by a trained paramedic about a St. Louis facility charged, by law and policy, with the care and custody of its residents. Paramedics respond to medical situations that have risen to the level of requiring immediate medical attention. By definition they are emergency responders. In Kimble's case this routine indifference and incompetence appears to have been continued at the cost of her life.

<u>False Reporting</u>

Also referenced in the St. Louis Post-Dispatch report is a glaring inconsistency regarding official CJC records relative to this incident. Those official CJC records show LaVonda Kimble was given Albuterol to ease her breathing three separate times while she was in the CJC.

The city medical examiner ran a special toxicology test specifically looking for the presence of Albuterol in Kimble's body during an autopsy and found none, a finding inconsistent with the CJC records showing three doses. That contradiction bolsters accounts of routinely false reporting regarding critical incidents at the CJC/MSI described by the COs and inmates interviewed for this preliminary investigation.

<u>Retaliation</u>

Following that incident, on a subsequent trip to the CJC on June 26, 2007, EMT's Seper and Girolami came into a still more hostile, even threatening, environment inside the CJC. Seper wrote to St. Louis Fire Department Chief Sherman George about their return visit:

*Medic 5 was dispatched to 200 S. Tucker at 01:18 June 26, 2007, we arrived on scene at 01:25.*

*We were met at the sally port by Lieutenant Hassle. Before we were even done putting all our equipment on our stretcher Lieutenant Hassle was asking us for our names and DSN numbers. My partner advised her that we were Medic 5C and that we would get them all the information they needed as soon as we took care of the patient. The Lieutenant guided us to the patient where we met Lieutenant Williams. I started patient care and my partner was standing with the Lieutenants approximately ten feet away. I heard one of the Lieutenants say "these were the girls who were here with LaVonda Kimble", and right after that my partner came into the room and said to me, "we need to get out of here now or call 704 because it's getting hostile out here." I told her let's go. Once we brought the patient back down to the medic unit, Lieutenant Hassle was standing in front of the medic unit watching us...Lieutenant Hassle's body language throughout the call made me feel uncomfortable and unsafe, and once Lieutenant Williams made the statement about us being the medic unit that treated and transported LaVonda Kimble, I feel that my partner's and my safety had been compromised at the Justice Center...*

These EMTs describe exactly the environment depicted by the COs and inmates providing information for this preliminary investigation.

Former St. Louis Fire Department Chief Sherman George had correspondence with former Public Safety Director Sam Simon regarding this case and the EMT complaint. Simon therefore knew what had been alleged and the basis upon which the allegation was made--namely, EMTs had entered a hostile, even dangerous environment at the CJC, rendered more hostile because they had gone public about conditions and practices at the CJC. Further, the hostility and potential danger they were exposed to came from COs in the CJC, not inmates.

# Inmates

**Inmate 1**

Inadequate Conditions/Physical Abuse/Medical Inattention

Inmate 1 (CJC) is a 76 year old man. A letter from him came indirectly to the ACLU-EM. He writes, "I have a medical history for seizures. I was recently involved in an altercation that landed me in the hole for 30 days. While I was in the hole, I was placed in a cell with no running water…I witnessed a beating so bad that the victim urinated blood, and I've put in medical requests and have not heard a response." The physical assault Inmate 1 witnessed and the medical neglect he describes are entirely consistent with other accounts provided for this preliminary investigation. The beating of the inmate in particular bears a similarity to the assault of Cedric Cross (see the account below) by a CO inside the CJC and his resulting internal injuries. His assertion that medical requests are ignored is one that is consistent with those of other inmates at the CJC/MSI,

Intimidation

Inmate 1 was subsequently visited and interviewed at the CJC by the ACLU-EM. Inmate 1 is a slightly built elderly man. He spoke softly, and he looked fearful. Rather than interview Inmate 1 in a visitor's booth, the ACLU-EM had attempted to get one of the larger visiting rooms, where visitors and inmates can speak a little more freely because of the open air space in the larger rooms. Inmates and visitors can seat themselves closer together and don't have to speak too audibly. When using the visitor's booth one speaks through Plexiglas with the phone receivers

and those calls may be monitored. If he could get to the large room, Inmate 1 said, he had much more information for us. We were informed by CJC staff that one of those rooms would not be made available to us, and Inmate 1was interviewed in a visitor's booth. He reiterated the allegations in his letter, but was clearly apprehensive about discussing other things he'd witnessed in the CJC. Inmate 1 talked about his fear of retaliation from COs at CJC if he said more than he had already but that he had been willing to write his letter in spite of his fears because at his age he just couldn't take what he witnesses being done to the inmates there almost daily. Yet, in spite of his apprehension he also appeared near bursting at the seams with urgency. When asked, for clarification, "You're saying there is more that you know--more that you want to tell--but you are afraid to tell now because someone might do something to you?" Inmate 1 nodded yes, silently asking for help without saying the words. He was old, tired, and on the verge of tears. Behind him, there was a view to other inmates who had heard we were coming and were trying to get our attention.


**Inmate 2**

Physical Abuse/Medical Inattention

Inmate 2 (MSI) wrote that on August 26, 2007 he was attempting to go and eat along with four other inmates. As he was passing through the steel bars of a gate on his way to go eat, Lt. Glenn Washington ordered CO Cedric Nichols to close the gate. Inmate 2 yelled out that he was in the gate, but Lt. Washington still kept telling CO Nichols to close the gate. Inmate 2's arm was closed in the gate as he was trying to remove his whole body from between the gate and the wall to keep from being hurt. He writes that he was seriously hurt as a result of having the gate

closed on him. He describes the pain in his arm and wrist from the injury as "15 on a scale of 1-10." When he initially asked for medical treatment, Lt. Washington told Inmate 2 to "kiss his ass" and that this was his (Washington's) jail and that he would not be fed [allowed to continue on to eat] nor would he go to medical. Inmate 2 stated further in his letter that Lt. Washington had made the statement to him with "such force that he scared me and I feared for my life and for retaliation against me and the four others that were deprived of a simple meal because they were last to come through the gate." He would later be treated and told by medical staff (not the doctor) he should be x-rayed. He filed an Informal Resolution Report and grievance forms. "So far to this day no one has a report of the incident." writes Inmate 2. At the time he wrote the letter he still had not been seen by a staff doctor. He concludes his letter, "Please, please, help me."

**Inmate 3**

Medical Inattention

In another letter, Inmate 3 writes that prior to coming to the CJC and while committing a crime, he was run over with a car twice by the victim's boyfriend. He subsequently had eight surgeries at Barnes-Jewish hospital. After the final surgery he was taken to CJC. Although by then he was disabled, he was denied physical therapy. Inmate 3 writes, "I've been a victim of hazardous conditions here too that I complained about and nothing was done even though I'm handicapped...I fell numerous times hurting myself bad, losing feeling in my legs that still affects me today." He also had "a big knot that turned into a hole because of the doctor's negligence at CJC...I was taken to Barnes Hospital for it."

"I had another incident where I was left on the floor for three hours with no help, talked about

and harassed by staff, and told by an administrator that no one was going to help me and then put in a room by myself on the floor hurt, alone with no help…I was then taken to Barnes Hospital about 14 days later and they kept me for an operation on my back…The doctor (at CJC) and the administrator knew of my condition and knew I needed medical attention but kept prolonging it…No one answers IRR's [Informal Resolution Requests] here…we are denied grievances, medical attention, and a lot more."

## Inmate 4

Inadequate Conditions

Inmate 4 is currently an ACLU-EM client represented by this affiliate in a case that is unrelated to this inquiry. Prior to this affiliate taking him as a client he was an inmate at MSI. Inmate 4 describes deplorable conditions inside the MSI. He states that in some cells there would be inmates that were sick or injured who had been left alone in that condition, and because of their sickness or injury they were not mobile enough to use the toilets without assistance. As a result, he says, he saw inmates who had slept in their own feces and urine for days and were refused help by COs. One CO told such an inmate "I'm not touching you--you need to ask somebody else (another inmate) to help you get cleaned up…I'm not cleaning up anything in there." He goes on to describe the rampant staph infection that results from the filth that fills the MSI. "I've seen inmates that have had fingers, toes, and legs amputated as a result of getting staph in that place." It should be noted that staph infection has been identified as a serious problem in the CJC/MSI. It is also a public health risk. At some point these inmates return to the St. Louis community and with them comes the ever increasing potential for the spread of this disease in the

general population. Particular strains of staph infection can be life threatening.

## Medical Inattention

Inmate 4 states that one way that inmates are frequently abused in the MSI is with neglect. For example, an inmate may seek assistance when he is injured, sick, or in a poor condition.  If he persists in asking for help after an initial refusal, the CO may refuse to allow the inmate to eat. Inmate 4 says that COs ignore medical emergencies or react with deliberate delay.  People who are already disabled are treated poorly and abused. In one instance Inmate 4 observed an inmate, who was wheelchair bound, dumped out of his wheelchair and onto the floor by a CO. He had accidentally rolled over the CO's foot while anxiously trying to make it to get his food.

## Physical Abuse

"Inmates get regularly assaulted for nothing by those COs, it's real bad but there's nothing that you can do. You can't bring it to the public," stated Inmate 4. "Then they leave people in the hole for 4 months when you [sic] were given thirty days…They deny visits, mail, they have you isolated away from the world and no one can see you."


## Inmate 5

## Physical Abuse/Inadequate Conditions/Non-Reporting

Inmate 5, an inmate at the CJC, wrote in a letter: "Within the previous 20 months of my detainment I have witnessed numerous miscalculations in judgment by said Director of Public Safety Sam Simon, that have violated the rights of the men housed in this facility. I have witnessed the placement of residents in life threatening and dangerous situations, gang beatings,

rapes, financial embezzlement, medical deprivation, contaminated food containers being delivered to housing units, unhealthy environments, etc." Inmate 5 continues in the letter, "mentally disadvantaged residents are housed in open population and are being taken advantage of, threatened with physical harm, bullied, raped, etc…The grievance procedures at this facility are being ignored. Corrections staff are writing phony reports on inmates, and their immediate supervisors are backing them up, in some cases there is sexual misconduct by staff on residents." This letter, received from an inmate, tracks point for point the descriptions of the CJC/MSI environment and culture provided by the COs interviewed for this preliminary investigation.

**Inmate 6**

<u>Medical Inattention</u>

Inmate 6 writes: "To whom it may concern...I am a[n] inmate at St. Louis Justice Center.... When I was arrested I was on medication for panic disorder. I have had my prescriptions from my doctor sent here and they still do not give me my medication... It's very hard for me when requesting my medication I was told that nothing happened to me, and there are others who are going through the same type of medical problems and worse guys have been stabbed with instruments. Instead of taking these people to the hospital they give them two aspirin and then ignore them and deny them any more treatment. Most of the guys just like me have no one on the outside to help with this issue so the justice center just take advantage of this we are treated like we are nothing. I understand that we have been charged with a crime but we are still human and most of us have not been convicted so we are innocent until proven guilty

and if you can help or if not would you please write and let me know that my cry for help is not ignored."

## Inmate 7

Medical Inattention/Inadequate Conditions/False Reporting

Inmate 7 (CJC) writes: "I've seen young men and women brought in shot up or badly beaten and haven't been receiving proper medical treatment. They are holding us in here on high bonds, without evidence or witnesses, with some falsifying reports just to hold people. They are collecting monies from innocent people and taxpayers...the guards treat the inmates any way they want, men and women are being held unjustly for two and three years before even seeing a courtroom. Staph infection is very often from lack of cleaning. Some days I myself do not receive medication. In here inmates don't have Constitutional rights. We as human beings need help from someone...please speak with some of the men and women in here. They would love the chance to speak out about actions in the Justice Center and Medium Security facility."

## Inmate 8

Physical Abuse

Cedric Cross had been a resident at the CJC. He contacted the ACLU-EM for help, alleging that he had been wrongfully and brutally assaulted by a CO while he was inside the CJC and then denied medical treatment there for his injuries. He had crawled out of the CJC, unable to walk, when he was officially released from the facility on March 29, 2007. Mr. Cross had been beaten so severely that upon his arrival at Barnes Jewish Hospital he had to have emergency surgery as

a result of the internal bleeding caused by his injuries.

Medical records from the surgeon/treating physician at Barnes Jewish Hospital substantiate Mr. Cross' claim that his injuries resulted from blunt force (assault).

**Inmate 9**

Medical Inattention

Inmate 9 is currently held in the MSI, arrested on a charge for which he says there is no evidence.  On February 24, 2009, Inmate 9 made the following allegation: David Brown, was died at the CJC just a few days after Inmate 9's arrest—on or about April 11, 2007. This is the date of Lovonda Kimble's death. Inmate 9 further alleged that Mr. Brown died as a result of medical neglect inside the CJC.  The allegation by Inmate 9 is the first notification the ACLU-EM has received of the alleged death and it was not disclosed publicly on the day that Lovonda Kimble died. That event was widely covered by the media. Time has not allowed the ACLU-EM to verify this account.

# Impacts

*"Whereas recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world..."*

*---The Universal Declaration of Human Rights*

This preliminary investigation has not yet discussed the general population currently housed in both facilities. Some inmates have been there for two years or more. We must not forget that they are innocent until proven guilty. In many instances they have not had any kind of hearing for extended periods of time. The Public Defender's office, overloaded and overworked, sends fatigued and underpaid attorneys to talk with the majority of clients about a plea. Too little attention is often paid to the facts in the case or any assertion of innocence by the inmate. Attorney/client relationships often become frustrating and adversarial, contributing still more to inmates' inability to exercise their rights. Desperate to be free from their dangerous and hopeless situation, inmates take a plea. They accept a criminal record to be with family, to keep a job, or to stay sane and healthy. This problem is so significant in its civil liberties implications that the Legal Committee of the ACLU-EM is identifying strategies to address the issue. The due process issue alone, when fully presented, warrants the independent review it is currently receiving from the ACLU-EM Legal Committee.

Lives have been damaged—and lost— in the absence of human rights and due process inside the CJC/MSI. Family members of inmates already know full well how their people are being treated. There is nothing they can do but prepare to receive, eventually, a family member

returning with even fewer resources and opportunities than he or she had before. There is also the incalculable loss to society when disillusioned inmates and their families disinvest from their communities.

This situation is not exclusive to St. Louis. Everywhere in the country these kinds of human rights abuses are reported and little is done about them. They have become entrenched in our criminal justice system. Reform is difficult when mainstream America cannot bear information that represents such a dramatic departure from our favored narratives about our ethics and morality. We have ignored or denied those failings which at times have put us on par with human rights violators whom we have denigrated throughout our history.

Too often we have avoided an honest inventory of our own adherence to our stated ideals, and have not made a meaningful commitment to hold accountable those who violate our standards.

To the extent that the race of these inmates is disproportionately African American, we remain a nation unable to live up to its own ideals of equal treatment under the law. The jails have been flooded with African Americans and other minorities due in no small part to the fact that inequity has been legislated into our laws, enforcement has been targeted at them, and at virtually every stage of the criminal justice process they have been treated with more severity and harshness whenever there is discretion to choose a greater punitive response to their offense, or a lesser one. On the other extreme, discretion has been removed from the process entirely when mandatory sentencing guidelines have applied.

# Conclusion

*"Whereas disregard and contempt for human rights have resulted in barbarous acts which have outraged the conscience of mankind…"*

*"Article 5.*

*No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."*

*---The Universal Declaration of Human Rights*

Given the nature of the environment at the CJC/MSI it is remarkable that any information was provided at all by the individuals contributing to this preliminary investigation.  COs are subject to retaliation and, given the level of abuse reported, it is easy to understand the reservations of inmates to report that abuse. For that reason, this preliminary investigation most likely presents a significantly lesser part of the whole picture of abuse inside the walls of the CJC/MSI.

 Furthermore, the eyewitness accounts of the COs and inmates are remarkable in their consistency and similarity. Time and again they reveal an environment in which abuse, often violent criminal assault, is an encouraged and protected activity at the CJC/MSI. Sick and injured inmates are mocked or left alone to suffer, while being denied medical treatment; some have apparently died as a result. Filth and disease are endemic. Drug commerce proliferates. Dissent against these crimes and abuses is punished. Human rights are not respected. The Constitution is virtually suspended inside the CJC/MSI, and those who have suspended it so do so with impunity.

ADS Moore and Superintendent Stubblefield are those most directly responsible for health and

safety in the City jails. In the chain of command, ADS Moore presides over the MSI, while Superintendent Stubblefield has dual responsibilities for the CJC and the Division of Corrections as a whole. If these allegations are correct, ADS Moore and Superintendent Stubblefield were literally running interference administratively for certain officers, to better position them for advancement despite violations of department policy and inmates' civil and human rights. Both have presided over the failed system described in this preliminary investigation.

 The allegations made by the six COs mandate further action to restore accountability and integrity to these institutions. Responsibility for solving these problems lies largely outside the jailhouse walls. The framework of St. Louis' governance places the jails within the Department of Public Safety; there is a duty attached to this job.

The Director of Public Safety is entrusted with oversight responsibilities for these facilities. The Director's official duties make it reasonable to expect that the Director would be aware of abuses such as those described in this preliminary investigation. The two Public Safety Directors during this time period were Sam Simon and Charles Bryson.

Director Simon was certainly aware from the newspaper accounts that two Emergency Medical Technicians described the CJC as a place where care is substandard, and indifference to the sick, suffering, and dying is the norm. Clearly, Simon also knew the EMTs felt their safety was threatened by COs.

Director Bryson's inquiry into the murder of Michael Stevens, described above, establishes that he has had communication with CJC administrative staff and COs regarding critical safety and policy issues. A complete inquiry would have likely led him to a deeper investigation into the general provisions for care, custody, and control that are provided by the staff for which he is

directly responsible. Several of the abovementioned COs report that there has been too little change, if any, since that inquiry. Most of the COs identified for alleged misconduct in this preliminary investigation remain on staff; overcrowding and unsanitary conditions have persisted.

The ACLU-EM has not been able to determine the extent to which the two Directors of Public Safety were aware of the culture of corruption which ignored policy and the rule of law.

In any case, the failures documented herein could well result in an increasing number of legal actions claiming civil liberties and human rights violations.  Lawsuits of this kind could cost St. Louis dearly.

 Ultimate responsibility, however, lies finally with the larger community. Each of us can drive past the CJC/MSI anytime; they are two more buildings in our community with people in them and cars on the parking lots. The MSI is on Hall Street, where local commuters drive for a while alongside the Mississippi river on Riverview heading into and from the city, before Hall Street intersects Riverview and veers off slightly through a stretch of trucking companies, small business, and light industry. Our ACLU-EM office is just minutes west of the CJC. The CJC is right across the street from St. Louis City Hall, and not too long a walk from Busch Stadium, where the Cardinals play baseball and families watch the games. Both buildings sit as cautionary symbols--places where a bad choice has led to a bad outcome for those inside.

Neither building strikes the average viewer as particularly ominous. We assume that the ethics and morality of our justice system are largely consonant with our own. We believe that in the spirit of law and order people will be held in those buildings to do time for their crimes and then be released having been held rightly accountable for their actions. In both buildings, however,

there are human rights violations of a kind our nation has often cited to justify international sanctions by the United States against other nations. As all but one of the interviewed COs said, separately and without prompting, "It's just not right, these people are human beings."

It's not right, nor is it lawful. The actions of the offending COs described in this preliminary investigation are extremely serious and should be consequential. To this point no local authorities have intervened. Nor would an internal audit serve any useful purpose, given the culture of threats and retaliation which would most likely keep information from surfacing. The violations of civil liberties and human rights resulting from these actions do open the door for the United States Justice Department, the U.S. Attorney's Office, and others, to force compliance with the Constitution. Furthermore, violent crimes against persons have been alleged; local and federal authorities must commit to prosecutions when the facts warrant it.

Without an intervention there is no reason to think that any of these conditions are going to change. Some combination of independent investigation, oversight, litigation, and advocacy must compel the reforms required here. A resource for employees, inmates and former inmates at the CJC/MSI should be established so that they can provide information, free from intimidation and retaliation, and the full extent of the violations can be known and addressed.

Hope rests in the faith that citizens who know the facts will push for reform. Many people already do know and care about prison conditions. Inmates and their families care. So do the citizens who came to the ACLU-EM asking for a public accounting of the situation. There are countless citizens who believe in civil liberties and the rule of law. There can be no better example of this fact than the Corrections Officers and inmates who have risked much to come forward and bear witness to abuses in the St. Louis CJC/MSI, which have continued too long.

# Correctional Center Policies

(Applicable Policies Highlighted)

Department of Public Safety / Division of Corrections

| Chapter: | 3 Institutional Operations | 3.1.21 |
|---|---|---|
| Section: | I Security and Control | Effective Date: *1/23/03* |
| Subject: | 21 Use of Force | Revision Date: 4/16/04 |
| Superintendent Approval: | | Date: |

## I.    POLICY

**To provide correctional staff** with guidance regarding the **use of force.**

## II.   PURPOSE

**To provide** guidelines **for** Correctional **Staff when they are confronted** with **a situation** requiring **the Use of Force.**

### III. STANDARD

**ACA Adult Local Detention Facilities,** ₃rd **Edition** (3-ALDF)

**3A-17 Use of Restraints**

**Revised** January *1995.* Written policy, procedure, and **practice provide that instruments of** restraint, **such as handcuffs, leg** irons, and **straightjacket,** are **never applied as** punishment and are **applied only** with **the approval of the facility administrator or designee.**

**3A-17-1  Use of Restraints   (Mandatory)**

Written policy, procedure, and practice provide that when an offender is placed *in a four/five*-point restraint (both arms, head and legs secured), or restraint chair advance approval must be obtained from the superintendent or designee. Subsequently, the health authority or designee must be notified to assess the in the inmate's medical and mental health condition, and to advise whether, on the basis of serious danger to self or others, the inmate should be placed in a medical mental health uniform emergency involuntary treatment with sedation and/or other medical management, as appropriate If the offender is not transferred to a medical/mental health unit and is restrained in a four/five-point position, or restraint chair the following minimum procedures will be followed:

Direct visual **observation by staff must be continuous prior to obtaining approval from the health authority or** designee;

: **Subsequent visual observation** must **be made at least every 15 minutes;** and,

Restraint procedures are **in accordance** with guidelines **endorsed by the designated health authority.**

Use of Force                                                                              3.1.21.1

**Department of Public Safety / Division of Corrections**

Placement in a four/five point Restraint or Restraint Chair beyond two hours requires the approval of the
Facility Administrator or designee.

**3A25: Security Equipment**

Written policy and procedure govern the availability, control, and use of chemical agents, and related security devices and specify the level of authority required for their access and use.

Chemical agents are used only with the authorization of the facility administrator or designee.  Staff below the rank of Lieutenant is not authorized to carry in their possession or utilize chemical agents.

**3A-28: Security Equipment.**

Revised August 1991. Written policy, procedure, and practice provide that written reports are submitted to the superintendent or designee no later than the conclusion of the tour of duty when any of the following occur:

- Discharge of a firearm or other weapon

- Use of chemical agents to control inmates

- Use of force to control inmates

- Inmate remain in restraints at the end of the shift

**3A-29: Security Equipment** *(Mandatory).*

Written. policy, procedure, and practice provide that all persons injured in an incident receive immediate medical examination and treatment.

Written policy, procedure, and practice restrict the use of physical force to instances of justifiable self-defense, protection of others, protection of property, and prevention of escapes, and then
only as a last resort and in accordance with appropriate statutory authority In no event is
physical force justifiable as punishment A written report is prepared following all uses of force and is submitted to administrative staff for review

**3A-32: Use of Firearms**

Written policy and procedure govern the use of firearms and include the following requirements:

- Weapons are subjected to stringent safety regulations and inspections.

- A.secure weapons locker is located outside the security perimeter of the facility.

- Except in emergency situations, firearms and weapons such as batons are permitted only in designated areas to which inmates has no access.

- Employees supervising inmates outside the facility perimeter follow procedures for the security of weapons.

Use of Force                                                                                         3.1.21.2

Department of Public Safety / Division of Corrections

- Employees are instructed to use **only as much force in** direct **contact as is needed to bring the offender to compliance with staff orders.**

- Employees on duty only use firearms **or other** security **equipment that have been approved** through **the facility and only when directed by or authorized by the facility administrator.**

## IV. DEFINITIONS

**Force:** Any **physical contact deliberately made by correctional** staff with **an inmate in a confrontational situation to control the inmate's behavior or to force an order. For physical contact between staff and** inmate **to qualify as** use **of force, the physical contact must be deliberate as opposed to accidental and employed to control the inmate's behavior.**

**Deadly Force: That force which is reasonably likely to result in the death or serious physical** injury of any **person against whom it is applied and** specifically **includes, but not** limited **to:**

- The discharge of a firearm; **or**

- . The use **of any impact weapon against the unprotected head of any person.** injuring **their heads.**

- Flex Cuffs: Adjustable, disposable plastic bands which are used **as temporary handcuffs or leg** irons to restrain **in individual.**

- Handcuffs: Metallic devices which are **placed** around both wrists **to keep the** hands restrained **closely**
- **together in order to** restrict **arm** and **had movement.**

- Leg Irons Metal locking **devices large enough to fit** around **the ankles and** connected **by a chain that allows the inmate to walk, but** hinders **the ability to run.**

- Padlock; A removable lock with a shackle..:

  Protective Handcuff Cover: A security **device that covers the locking** mechanism **on handcuffs.**

- Restraint: Any **device** designed **to** restrict **the movement of an individual including, but not** limited **to, handcuffs, leg** irons, **flex cu~ and restraint chairs.**

- Restraint Chair: A chair equipped with wrist and *leg irons* used to restrict **the movement of an inmate while the inmate is seated in an upright position.**

- Transport Belts: Metal **or** leather devices **which** are placed around a person's **waist to provide an anchor point for the attachment of** handcuffs **in order to restrict the movement of the arms.**

Use of Force                                                                 3.1.21.3

Department of Public Safety *I* Division of Corrections

V.      **FORMS**

**The following forms are included within** this **policy and procedure:**

> **Officer's** Report
>
> Witness Report
>
> Investigating **Supervisor's** Report
>
> Shift Commander's Report
>
> Chief **of** Security **or Assistant Chief of** Security Report
>
> **Use of Force Cover** Letter
>
> **Use of Force** Log

VI.     **PROCEDURES**

**The following steps will be implemented whenever possible, in order to give an inmate every opportunity to cooperate** and **avoid the** use **of force:**

A.      <u>**Alternatives to Force:**</u>

>   1.      **Whenever possible,** alternative **methods to resolve a conflict** will **be exhausted before force is** used. *Example: Inmate refuses an order.* **Force will never be the** first **response. Employ the** following techniques **if** possible:
>
>   >   A.      Keep **a safe distance** (Reactionary Gap).
>   >
>   >   B.      Listen4o-thenmateand-ask-forMs/her-cuop~afion
>   >
>   >   C.       **Explain the consequences of the inmate's behavior.**
>   >
>   >   D.       **Request the assistance of a supervisor** and additional staff
>   >
>   >   E.      **Demonstrate a show of force by the assimilation of CERT team or Emergency Squad**

B.      <u>Physically</u> <u>touching</u> <u>an</u> <u>inmate: There</u> are only two (2) authorized situations for any staff member to touch or come in physical contact with an inmate, and they are:

>   1.      <u>**Searches:**</u> **When conducting searches which** require **physical contact** with **the body of an** inmate; **or**
>
>   2.      <u>Use</u> **of** <u>Force</u>**: In those situations that are in compliance with these Policies and Procedures**

Use of Force                                                                                                            3.1.21.4

Department of Public Safety *I* Division of Corrections

**NOTE:**   **ANY OTHER PHYSICAL CONTACT IS STRICTLY PROHIBITED!**

Any observed contact will be grounds for disciplinary action.

C.     Direct **Contact Force**: **The** first **level of force available to staff is the use of** directly applied **force. Physical handling is** justified to subdue **unruly inmate; to separate participants in a fight, in self-defense; and in defending staff; inmates, or other persons. It may also be used to move inmate who fail to comply** with lawful **orders.** As with any **use of fore; the amount of force used in direct contact will be only as much as is needed to bring the** inmate into compliance with staffs **lawful** orders. **The following types of** direct **contact force is not intended to be all  inclusive; but rather examples.**

   1.     Apply a combination of blocks **or control holds to prevent the inmate from** •**continuing** his/her **attack.**

   2.     **Employ a chemical agent (pepper spray), if** trained **and authorized, to temporarily disable the inmate.**

   3.     **Employ an authorized weapon such as baton, if** authorized and trained in use, livery reasonable effort should be made to avoid blows to the head and vital areas when using a weapon. **Using a weapon a club is prohibited, except as a last resort where there is no practical alternative available to prevent serious physical** injury **to the officer Strike the inmate** with **one (1) or more blows until the inmate discontinues the attack** and is under **control Blows should be** directed away from **the head** and **other vital organs and kicks should be avoided.**

D.   **Anticipated Use Of** Force.

         I.Whenever **the use of force is anticipated and the inmate does not pose an immediate** threat, **a supervisor will be notified** and **all actions** will be **under the supervisor's direction. If the** officers' **actions** are **inconsistent with these guidelines the officer may be subject to disciplinary charges in addition to Mo. Criminal** Statues and Federal **Civil Statutes, "Deprivation** of Human Rights" and "Infliction of Cruel and Unusual Punishment".

Use of Force                                                                                       3.1.21.5

Department of Public Safety / Division of Corrections

In an emergency case or situation where it is not possible or practical to notify a supervisor the staff may use appropriate force consistent with the guidelines contained herein. At the end of the incident the supervisor will be notified as soon as possible.

2.    The Shift Commander will ensure that the Video Camera is used to accurately record the events as they happen during any Use of Force incident that can be anticipated (not spontaneous).

B.    <u>Impermissible</u> <u>Force</u>: Force may not be used to punish, discipline or retaliate against an inmate. The following acts are strictly prohibited:

1.    Striking an inmate to discipline him/her for failing to obey an order.
2.    Striking an inmate; when grasping him/her to guide them would achieve the desired result.
3.    Using force against an inmate after he/she has ceased resistance.
4.    Striking an inmate with institutional equipment such as keys, handcuffs and flashlights or striking an inmate restrained by a mechanical device, will not be allowed.  Only as a last resort may institutional 4equipment be used to prevent serious physical injury.
5.    Employing a choice hold or unauthorized weapon such as a blackjack or intentionally striking an inmate's head against the wall, floor, bars or other objects.

Note: A head lock may be permissible under certain situations; however, choke holds are strictly prohibited. Choke holds cutoff the supply of oxygen to the brain which may result in serious physical injury and/or death.

F.    <u>Medical</u> <u>Attention</u>: Whenever force or a chemical agent is used against an inmate, the staff involved or witnessing the incident will, as soon as possible, have the inmate and injured staff examined by medical staff to determine the extent of any injures.

Use of Force                                                                              3.1.21.6

Department of Public Safety / Division of Corrections

-•  G.     Use of Force Reports: All Staff who employ or witness the application of force or is the subject of use of force allegations will immediately report the incident to their immediate supervisor (or any supervisor if their immediate supervisor is unavailable). MI staff who employ or witness the application of force or who are present at the scene, will prepare a written report concerning the incident before leaving the facility unless medically unable to do so. (See Use of Force Report Part A)

Necessary medical attention will not be delayed in order to obtain an immediate report. The report will include the following:

1.      Each employee directly involved or a witness to a Use of Force will provide a complete written account of the events leading to the use of force.

Documentation will include but not limited to; whether force was anticipated and if a supervisor was notified prior to the use of force being employed.

2.      A precise and accurate description of the incident to include specific reasons why force was necessary and what type of force was employed. *Example: control holds blows, etc.*

3.      A description of any weapon used and the manner in which it was used.

4.      A description of any injuries sustained by inmates or staff and the type of medical treatment provided

5.      A list of all participants, witnesses and persons present at the incident and their actions to include Inmate witnesses,

6.      All participants will complete Part "A" of the Use of Force Report. All witnesses will complete Part "A-I" of the Use of Force Witness Report, and both reports will be submitted before the end of the tour of duty. Parts "A", "A-1", "B", "C", along with supporting documents will be submitted to the Chief of Security through channels prior to the End of The Shift

.      Additional time to gather evidence and write reports will be evaluated and granted on an individual basis. (Refer to Form #'s: 808-100,808-200, 808300, & 808-400)

Use of Force                                                                                                    3.1.21.7

Department of Public Safety / Division of Corrections

A.  All requested information on the Use of Force Report shall be documented
if applicable. Supplemental attachments shall be completed when
additional space is needed to complete any section of the Use of Force
Report.

H.  **Incident Investigation**

1.  Upon receiving notice of a use of force, the supervisor responding will insure
that any injured staff or inmates receive medical treatment. The supervisor will
then notify the Shift Commander and report all the facts concerning the incident
which are known at the time.

2.  The Shift Commander will assign a supervisor to investigate the incident. The
Shift Commander will then report all the facts of the incident known at that time
to the Chief of Security, If the Shift Commander was involved in the incident or
witnessed the incident, another supervisor will be assigned to conduct the
investigation. The investigating supervisor will complete part "B" of the Use of
Force Investigating Supervisor's Report. No Supervisory Staff either involved in
or a witness to the Use of Force shall be permitted to investigate the incident:

3.  The Shift Commander shall conduct a briefing on all Use of Force Incidents to ensure that all
reports are completed as stipulated by procedure.   The briefing shall include all
staff participants and staff witnesses to the Use of Force Incident.

A     The Shift Commander Shall complete Part "C" of the Use of Force
Report, attached the Use of Force Cover Letter and submit a complete Use
of Force Report to the Chief of Security

4.  The Chief of Security will review all use of force incidents, record his/her
conclusions and recommendations on Part "D" on the Use of Force Report.

5.  All video recordings of Use of Force shall be properly secured and forwarded to the Chief of
Security.

A. The Chief of Security shall review the Video Tape and document any discrepancies noted in the
Written Reports and the Video.

B The Chief of Security shall label the Video preferably by Inmates Name, and location of the
Incident and provide the date of the Incident on the outside compartment of the video.

Use of Force                                                                                                  3.1.21.8

Department of Public Safety / Division of Corrections

C.     The Chief of Custody shall then Log the Video and a Use of Force Log
       and forward the original Video to the Divisions Internal Affairs Unit.

D.     The Internal Affairs Unit shall maintain the safekeeping of the Video for future reference,
       The Internal Affairs Unit will maintain an Inventory of all Video Tapes for the Division.

## VII. TRAINING

Training on this Policy I Procedure will be included in the Basic Training and during the (40 Hour) In-Service Training
when deemed necessary.

Use of Force                                                                       3.1.21.9

Department of Public Safety / Division of Corrections
CHAPTER         3  Institutional Operations

| SECTION:       2  Safety and Emergency Procedures<br><br># Emergency Medical Response | EFFECTIVE DATE:<br><br>3-29-04                    I |
|---|---|
| APPROVED:        Gene Stubblefield | REVISION DATE:<br>July 16, 2007<br>. . |
| COMMISSIONER OF CORRECTIONS | |

Reviewed: 3/07. Replaces Emergency Treatment of Injuries.

## I.        POLICY

The Division of Corrections staff will assist inmates, visitors and staff if medical emergency arises *within* the facility. The Division of Corrections will comply with all applicable standards according to the American Correctional Association (ACA) and the National Commission of Health Care (NCHC) in the application of first aid and other life saving techniques when responding to medical emergencies. Qualified health professionals will be provided to treat injuries, stabilize, assess and refer medical emergencies for further treatment to a suitable medical facility.

## II.        PURPOSE

The purpose of this policy is to provide general guidelines for responding to calls for emergency medical assistance, treatment of injuries, referrals and transfer of person(s) with injuries to an appropriate medical facility for proper medical care.

## III.        APPLICABILITY

All facility assigned staff, volunteers and contractors are responsible for adhering to the following procedures.

## IV.        STANDARDS

ACA Adult Local Detention Facilities, 4th Edition

4D-08
(MANDATORY) Correctional and health care personnel are trained to respond to health-related situations within a four-minute response time. The training program is conducted on an annual basis and is established by the responsible health authority in cooperation with the facility or program administrator and includes instruction on the following:

3.2.14: Emergency Medical Response                                   Page 1 of 10

Department of Public Safety / Division of Corrections

- recognition of signs and symptoms, and knowledge of action that is required in potential emergency situations
    - administration of basic first aid

- certification in cardiopulmonary resuscitation (CPR) in accordance with the recommendations of the certifying health organization

- methods of obtaining assistance

- signs and symptoms of mental illness, violent behavior, and acute chemical intoxication and withdrawal

- procedures for patient transfers to appropriate medical facilities or health care providers

- suicide intervention

4D-09

First aid kits are available in designated areas of the facility as determined by the designated health authority in conjunction with the facility administrator. The health authority approves the contents, number, location, and procedures for monthly inspections of the kit(s) and written protocols for use by non-medical staff an automatic external defibrillator is available for use at the facility.

## V.    DEFINITIONS

**Code 3: The universal emergency medical code** alert used to summons Medical staff for

emergency medical assistance.

**Corrections Medical Services** (CMS): The agency contracted by the Division of Corrections to

provide medical, dental, and mental health services to the inmates housed at the

MediumSecurity Institution and the St. Louis City Justice Center and commonly referred to as

the "medical staff."

Correctional *Staff* Member: For the purpose of this policy is defined as custody staff,

contractors and volunteers.

Emergency Medical Services (EMS): The St. Louis City Fire Department's medical emergency

response unit.

Custody Medical Officer: A custody staff member assigned to medical Unit for a Correctional

Officers' daily routine functions.

3.2.14: Emergency Medical Response                                    Page 2 of 10

- Department of Public Safety / Division of Corrections

VI.   CANCELLATION
This policy cancels all previous Division policies, statements, memorandums, directives, orders, notices, rules and regulations which are inconsistent with this policy. -                           -

VII.   GENERAL INFORMATION

The Human Resource Manager will collaborate with the Division Health Service Administrator and develop an instructional program that will be utilized by the Training Academy for employee development training. The following instructions will be included:

a.   Expected response time during code 3 alert,

b.   recognizing signs and symptoms, and knowledge of action that is required in potential emergency situations,

c.   administration of basic first aid,

d   certification in cardiopulmonary resuscitation (CPR) in accordance with the recommendations of the certifying health organization,

e.   methods of obtaining assistance,

f.   recognizing signs and symptoms of mental illness, violent behavior, and acute chemical intoxication and withdrawal,

g.   procedures for patient transfers to appropriate medical facilities or health care providers,

h.   recognizing suicide tendencies and how to intervene,

i.   certification in the use of automatic external defibrillator in accordance with the recommendation of the certifying health authorities,

j.   The Divisional Training Coordinator will consult with Shift Commanders and Unit Supervisors to schedule training sessions, and will maintain training records,

2.   The Health Service Administrator in conjunction with the facility administrator or designee will determine the locations of first aid kits at CJC and MSI (See policy #4.2.20: First Aid Kits).

3.2.14: Emergency Medical Response                                    Page 3 of 10

Department of Public Safety / Division of Corrections

3.      The Master Control Center at CJC, the Control Center at MSI and the Medical department at both facilities will have a direct telephone line capable of executing outgoing and incoming calls, and used for communication with EMS.

4.      Medical staff assigned at MSI and CJC will be provided with two-way radios to use when appropriate, for communication during medical emergencies.

5.      The Shift Commander will assign a Correctional Officer to escort inmates that are required to be transported by EMS to an outside medical facility for emergency treatment (See policy #3.1.8: Inmate Transport for Medical Treatment).

6.      In all medical emergencies, Correctional staff members are expected to cooperate fully with medical staff when such cooperation is necessary to save life. The Correctional staff member is expected to remain aware of the safety and security of  inmates, staff and visitors.

7.      In the event of a medical emergency, Custody staff members should bear in mind that the first four minutes of response time to a medical emergency is critical. Custody staff members at, or first to respond at the sight of a medical emergency are expected to take action quickly and not wait for medical staff before starting basic first aid treatment and/or CPR. -

8.      The Master Control /Control Center Officer will give top priority to opening and overriding doors along the route taken by medical staff and EMS staff responding to a medical emergency.

9.      The Shift Commander or designee will ensure that an Incident Report is completed by each Correctional staff member that responded to the scene of a medical emergency (See policy #3.1.10 Incident Report).

VIII.   FORMS

The following forms are included within this policy and procedure:

Incident Report
Inmate Injury Report
Staff Injury Report

IX.     PROCEDURES

A.      Initial Response to Medical Emergency

If a Correctional staff member discovers a potential medical emergency and a medical staff is not present, the employee will immediately notify the floor supervisor or immediately notify the Master Control/Control Center Officer via radio or telephone to announce a code 3 alert to summon medical assistance.

3.2.14: Emergency Medical Response                                     Page 4 of 10

Department of Public Safety / Division of Corrections

6.     The medical staff will gather necessary equipment and proceed to the location of the Code 3.

7.     The Custody Medical Officer will clear the main corridor of inmates for the exit of medical staff as they depart to the location of the Code 3.

8.     The Master Control Supervisor at CJC will authorize the override of interlocking doors and/or elevators when necessary to facilitate movement to the location of the Code 3 (See policy #3.1.16 Door Control).

9.     The Master Control/Control Center Officer will monitor the medical staff movement via CCTV and/or radio, give priority, unlock and open doors enroute to the location of the Code 3.

10.    The Shift Commander and Area Supervisor will respond to the location and ensure the following:

     a.     First aid and/or CPR techniques are administered if necessary.

     b.     Ascertain the name, date of birth, assigned cell and nature of charge of the inmate; and pass on same information to Master Control/Control Center Officer. The Master Control/Control Center Officer records the information in the Daily Activity Log and/or IJMS Event Log.

     c.     Assess the situation and if necessary secures the area as a potential crime scene (See policy #3.1.19 Crime Scene).

     d.     The Shift Commander or designee contacts the Officer of the Day and, if necessary, the Division Investigators, depending on the nature of the situation and if a criminal violation or death is suspected.

11.    When medical staff arrives at the location of the Code 3, they will assume the responsibility of treating the victim.

12.    When appropriate, medical staff will advise the Shift Commander or designee that the victim (s) being treated should be transferred to the facility medical department or to a medical provider outside the facility for emergency medical treatment. The Shift Commander/designee will coordinate movement with the Master Control/Control Center Officer.

13.    Only the inmates may be treated in the facility medical department for non-life threatening emergencies

14.    If medical staff determines the victim should be transported outside of the facility for emergency medical treatment, the Shift Commander or designee will instruct the Master Control/Control Center Officer to contact EMS.

3.2.14: Emergency Medical Response                                      Page 6 of 10

Department of Public Safety / Division of Corrections

15.     Visitors will not be treated in the facility medical department and will be referred to EMS for transportation to a medical provider outside of the facility.

16.     The Shift Commander or designee will ensure that an Incident Report, Inmate Injury Report or Staff Injury Report is completed (see policy #3.1.10 Incident Report).

B.      Notification and Response to EMS

When the medical staff determines that EMS should be called, that staff person will directly inform the Shift Commander or designee.

2.      The Shift Commander or designee will instruct the Master Control/Control Center Officer via radio to contact EMS; and gives the Master Control/Control Center Officer the nature of the medical emergency, gender information and age of the patient, for pass-on to EMS.

3.      The Master Control Control Center Officer will immediately contact 911 using the medical emergency telephone in Master Control/Control Center and informs the dispatcher of the nature of the emergency, gives the dispatcher the Master Control/Control Center medical emergency telephone number for call back; requests to have EMS respond to the facility, and gives the dispatcher the entrance location:

   a.     If the medical emergency is located in the secure area of the facility at MSI, EMS will use the vehicle sally port and enter through the processing department. The Shift Commander or designee will assign a Correctional Officer to await their arrival and to escort the EMS crew to the location of the medical emergency. The Shift Commander may assign an additional Correctional Officer to escort the Fire Engine Crew or Para Medic and Ambulance responding to the same 911.

   b.     If the medical emergency is located in the secure area of the facility at CJC, EMS will use the vehicle sally port and enter the south side of the facility. The Shift Commander or designee will assign a Correctional Officer to await their arrival and to escort the EMS crew to the location of the medical emergency. An additional Correctional Officer may be assigned to escort the follow-up Fire Engine Crew or Para Medics and Ambulance responding to the same 911 call.

   c.     The Master Control Officer at CJC will notify the vehicle sally port Control Center Officer by phone that EMS and the St. Louis Fire Department crew are en-route to the facility.

3.2.14: Emergency Medical Response                                    Page 7 of 10

Department of Public Safety / Division of Corrections

       d.     If the medical emergency is located outside of the secure area of the facility at MSI or CJC, EMS may be permitted to enter the facility through the front lobby entrance.

4.    The Master Control/Control Center Officer records the time in the Daily Activity Log and/or in the IJMS Event Log when the EMS was called and the reason for the call and who authorized the call. The name of the inmate or the person to whom the emergency was called will also be recorded in the logs.

5.    When EMS crew arrives in the facility, the escorting Correctional Officer will notify Master Control/Control Center Officer and the Shift Commander by telephone or radio and escorts the crew to the location of the medical emergency. The Master Control/Control Center Officer will record in the Daily Activity Log and/or in the IJMS Event Log the time the EMS and the Fire Department crew arrived in the facility.

6.    Once the EMS crew arrives at the actual scene of the emergency, the escorting Correctional Officer or the Shift Commander/designee writes down the time of arrival at the actual emergency scene, obtains the names, DSN number and the MEDIC/Fire crew Engine number from the EMS/Fire crew supervisor. The Correctional staff member passes the same information to Master Control/Control Center Officer.

7.    The Master Control/Control Center Officer records in the Daily Activity Log and/or in the IJMS Event Log the information passed on by the escorting Correctional Officer or the Shift Commander/designee reflecting the same information given.

8.    The Shift Commander records the same information in the appropriate logs.

9.    The Master Control/Control Center Officer will give the escorting Correctional Officer and EMS top priority to the medical emergency location according to procedures found in Procedure A: 7 thru 9 of this policy.

10.    The Shift Commander or designee will assign a Correctional Officer to escort inmates that are required to be transported by EMS to a medical facility for emergency medical treatment (See policy #3.1.8 Inmate Transport for Medical Treatment).

11.    If the Divisional medical staff or the responding EMS crew suspects an inmate has expired, the Shift Commander or designee will notify the Officer of Day and Division Investigators (See policy #3.1.16: Inmate Death).

12.    The Master Control/Control Center Officer records the time the EMS crew leaves the building. If an inmate or the person to whom the emergency was called is transported to outside medical facility, the Master Control/Control Center Officer

3.2.14: Emergency Medical Response                           Page 8 of 10

Department of Public Safety / Division of Corrections

records the pertinent information including time, name of inmate, facility transported to, nature of charge, etc., in the Daily Activity Log and/or in the IJMS Event Log.

C.      Medical Emergency in Medical Unit

1. If medical emergency occurs in the Medical Unit of the facility, the (CMS)

medical staff person immediately notifies the Custody Medical Officer.

2.      The Custody Medical Officer calls the immediate supervisor and the Shift Commander immediately by radio or telephone and notifies them of a Code 3 in the Medical Unit.

3.      The Custody Medical Officer records the necessary information in the Daily Activity Log and/or in the IJMS Event Log, and submits appropriate report to the Shift Commander.

4.      The medical staff evaluates the situation and makes a decision. If EMS must be called, the medical staff places the call using the medical emergency telephone in the medical unit.

5.      The medical staff immediately passes the EMS call-placement information to the Custody Medical Officer. The Custody Medical Officer notifies the Shift Commander and the Master Control /Control Center Officer via radio or telephone that EMS has been called, and gives time of the call.

6.      The Custody Medical Officer obtains the inmate pedigree information and the nature of the medical emergency and passes the information to the Master Control/Control Center Officer, the Shift Commander; and records same information in the Daily Activity Log and/or in the IJMS Event Log.

7.      The Shift Commander or designee assigns a Correctional Officer to await EMS arrival and to escort the EMS crew to the location of the medical emergency. The Shift Commander may assign an additional Correctional Officer to escort the Fire Engine crew or Para Medic and Ambulance responding to the same 911 call.

8.      The Master Control Officer at CJC notifies the vehicle Sally port Control Center Officer by phone that EMS and the St. Louis Fire Department crew are en-route to the facility.

9.      The escorting Correctional Officer implements the steps outlined in procedure B, item #4 and 5 of this policy.

10.      The Master Control/Control Center Officer implements the steps outlined in procedure B, item #6 and 7 of this policy.

3.2.14: Emergency Medical Response                                            Page 9 of 10

Department of Public Safety / Division of Corrections

11.     The Shift Commander/designee implements the steps outlined in procedure B, item #8 and 9 of this policy.

12.     When the EMS crew arrives at the scene, the Custody Medical Officer adheres to the Post Order Manual and records all pertinent information including the information as stated in procedure B, item#6.

13.     The medical staff member completes incident report and forwards the report to the Shift Commander.

XI.     SEVERABILITY CLAUSE

If any part of this policy is, for any reason, held to be in excess of the authority of the appointing authority, such decisions will not affect any other part of this policy.

XII.    TRAINING

This policy and procedure will be included in the First-Year and subsequent In-Service Training for staff having direct contact with the inmate population and authorized to use chemical agents.

3.2.14: Emergency Medical Response

Department of Public Safety/Division of Corrections
POST ORDER MANUAL

Post Order:   Housing Unit Assignment
Position:       Correctional Officer I
Location:      CJC - General Housing Units
Operation Hours:        Sundays — Saturdays 24 Hours Period

Effective Date:        _____

Approved:                                                                        DATE:

**Gene Stubblefield**

COMMISSIONER OF CORRECTIONS

I.       General Information

This Post Order establishes guidelines for the security, custody, and control of inmates assigned to general population housing units. The Housing Officer is responsible for diligently conducting all duties, to include, the enforcement of all rules and supervision of all activities (Count, Recreation, Medical, Programs, etc.) in the housing unit and interact with inmates using the principles and dynamics of Direct Supervision. The Housing Officer shall report to and/or seek the advice of the Floor Supervisor with regards to any circumstances not covered by this Post Order. This Post Order shall be kept at the officer's work station convenient for staff review. The Post Order and Post Operations Manual shall be kept secured from inmates and safe from avoidable damage.

II.      General Responsibilities

1.       The Housing Officer shall report for duty as scheduled, and shall dress in full uniform in accordance with the established Uniform Dress Code; and pick up a radio and duress alarm, attend Shift briefing as scheduled, and report to assigned post.

2.       The Housing Officer shall further be briefed by the officer being relieved of duty upon arrival on assigned post, to ensure the communication of critical information. The "critical information" briefing shall be logged into the TJMS event log.

3.       The Housing Officer being relieved shall record the name and the time the relieving Officer arrived in the Housing Unit to assume post, and documents that critical information was passed on to the relieving Officer.

4.       The Relieving Officer will record own name, the arrival time in the Housing Unit, the name of the Officer being relieved, the nature of the critical information received from the Officer being relieved, time head count was conducted with

DOC Post Order: Housing Officer                                              Page 1 of 11

Department of Public Safety Division of Corrections
POST ORDER MANUAL

3.   The Housing Officer shall enforce all established Housing Unit rules according
     to the Inmate Handbook and other Divisional policy and procedures.

4.   The Housing Officer shall make routine inspections of the unit a minimum~ of
     once every hour during a Watch Tour.
     a.      One Inspection shall be documented in a Security Inspection Report. This
             report shall include an inspection of walls, floors, ceilings, windows,
             bars, and fixtures located within the unit. The report shall be forwarded
             to the Floor Supervisor upon completion.
     b.      The Housing Officer shall conduct cell inspections daily and as required
             by facility policy and procedures for new admitted
             inmates and inmates released from the unit.
     c.      The Housing Officer shall conduct an inspection of the recreation area,
             visitor booths and multipurpose room before and after use of each area.

5.   The Housing Officer shall conduct daily searches of cells and inmate
     properties.

6.   The Housing Officer shall prepare for the facility Official Count by
     ensuring that all activities such as school and recreation have ceased and
     inmates are in position to be counted in accordance with the facility
     count procedures. The exception to this procedure includes inmates being
     moved for bond, moves to MSI, attorney visits (contact or non-contact)
     and calls for police department line ups.

     a.      Upon the announcement of the facility Official Count, the Housing
             Officer shall conduct a physical count of all inmates in the unit.
     b.      The Housing Officer shall not rely on a paper count or the Epic Photo to
             compile an accurate count.
     c.      The Housing Officer shall carefully inspect all shower, multipurpose
             rooms, storage closets, restrooms, dayrooms, cell, etc. to ensure that no
             inmate is concealed during the count.
     d.      Upon completion of the count, the count total shall be forwarded to the
             Floor Supervisor and logged in the Housing Unit Daily Activity Log in
             accordance with the established count procedures.

7.   The Housing Officer shall conduct an inspection of inmate armbands
     during the officer's watch tour as required by facility policy and

DOC Post Order: Housing Officer                                    Page 3 of 11

Department of Public Safety/Division of Corrections
POST **ORDER** MANUAL

12. The Housing Officer shall follow the use of force procedure when it is   necessary to control inmate behavior. Force shall not be used in an arbitrary or capricious manner. Only the minimum amount of force necessary to Control the inmate behavior is used.

13. The Housing Officer shall follow the facility safety and emergency procedures when faced with a threat to unit security, during a medical emergency or other crisis that compromise unit security or the welfare of staff and inmates. The  Housing Officer shall contact the Floor Supervisor and/or Master Control immediately during an emergency to advise of any action taken and to receive further instructions or directions.

14. The Housing Officer shall supervise meals and other scheduled and unscheduled activities, services and programs.

    a. The Housing Officer shall receive the inmate food cart in the unit, count and  match the number of food trays with the number of inmates assigned in the unit and record this in the IJMS Housing Unit Even Log.

    b. The Housing Officer shall closely supervise inmate workers involved in the serving of the meal to avoid contaminations, theft or other disruption to the meal process.

15. The Housing Officer shall monitor inmates for any unusual behavior. Inmates who exhibit suicidal, bizarre or any other disturbing behavior shall be reported immediately to the Floor Supervisor and Mental Health staff to initiate appropriate interventions.

16. The Housing Officer shall effectively supervise inmate workers to ensure that they complete all assigned tasks without interfering with the facility operations. Inmate workers shall not be allowed to use work time for social interaction or  recreation.

IV.     Maintenance, Sanitation, Safety, and Emergencies

The Housing Officer shall ensure the cleanliness of the unit in accordance with Facility sanitation requirements.

    a. Cell and activity areas will be kept clean (routinely swept and mopped).

    b. Meals trays are to be removed from the area immediately after each meal.

    c. Trash containers are to be routinely empted, cleaned and replaced with new trash liners after each meal.

DOC Post Order: Housing Officer                                        Page 5 of 11

Department of Public Safety/Division of Corrections
**POST ORDER** MANUAL

workers clean the mattresses. When the mattresses return to the housing unit, they must be cleaned again by the housing unit worker.

c.   Any mattress that is cracked with frayed material and the mattress cotton is exposed, shall be disposed of and replaced.

2.      The chemicals recommended for cleaning mattresses shall be mixed in accordance with the instructions on the label. The use instructions for any concentrated cleaning agent include:

a.      A half ounce of the concentrated chemical per gallon of water.

b.      The solution shall be poured (supervised by staff) in a marked spray bottle.

c.      Spray 6-8 inches from the surface.

d.      Rub the mattress with a sponge, brush or cloth.

e.      Allow to air dry.

f.      If bleach is used, it shall be diluted (by the HTJ Officer) with 1 part bleach to 10 parts water using the cleaning procedure described in 2 c thru e above.

g.      When using the above chemicals, the inmate workers shall wear the following personal protective equipment.

   1).      Disposable gloves
   2).      Face Mask
   3).      Eye Protection

h.      If diluted other than instructed, the chemicals will loose their potency and will not be effective. Also the chemicals shall not be diluted and then stored for more than 24 hours. The chemicals should be mixed within 24 hours prior to their use.

**VI.**      HU Officers' Role in RU Moves:

Upon the Floor Supervisor's notification, the HU Officer will alert the inmate to gather property and report to the HU slider.

2.   The Housing Unit Officer will make changes on JJMS by placing the exiting inmate's name onto the transfer list on IJMS.

DOC Post Order: Housing Officer                                         Page 7 of 11

Department of Public Safety/Division of Corrections
**POST ORDER** MANUAL

2.   This list shall be updated by the HU Officer of each shift when a new inmate enters the unit and is placed on a boat.

3.   When a bunk becomes available and a decision is made to move the inmate, the date the inmate moved onto a bunk cited on the list, if an inmate on the waiting list is skipped, a reason must be documented under date moved onto a bunk i.e. "inmate refused".

4.   As inmates vacate beds for the purpose of release or transfer from the Institution, the HU Officer:

   a. Contacts the HU Management Log when the inmate leaves immediately,
   b. Reviews the Bed/Boat Seniority Waiting List. If there is no waiting list on the "H" Drive for the officer's assigned unit, the officer creates a  waiting list by following the steps below:

      1)   View the RU Management Log and the names of all of the inmates placed on boats.

      2)   Open IJMS.

      3)   Search for the name of each inmate on a boat.

      4)   View the inmates' Full Profile.

      5)   Scroll down to the inmate's HU Cell History.

      6)   Identify the date that the inmate was placed in the unit.

      7)   Write that date on the Management Log next to the inmates' name.

S.   Once all names have been searched and the dates of unit admission have been identified, create a document on "H" Drive using a form located in a yellow folder entitled Bed-Boat Seniority Waiting List, as follows:

      a.   Selects the inmates on boats waiting longest for bunk space,

      b.   Discusses the move with the inmate,

      c.   Makes an assessment of cellmate compatibility i.e. Age, size, weight etc.

DOC Post Order: Housing Officer                                          Page 9 of 11

Department of Public Safety/Division of Corrections
**POST ORDER** MANUAL

a. The workers' units will not be locked down from 1 p.m. to 2p.m., except on Wednesdays, during general cell cleaning. Workers' units are open units and should only be locked down during count time; staff breaks (if there is no relieving officer), at the end of the 2" Shift, and throughout the 3" Shift when every Housing Unit is locked down for the night.

b. During the 3 to 4 p.m. cell search time, workers' units will remain unlocked unless the workers cells are being searched.

c. The Floor Supervisor shall use officers from a different Housing unit, and not from the worker's units, to conduct the search.

d. Kitchen workers who come from the lower level at 7:30 p.m. shall not be locked down upon entering the unit. Kitchen workers who come from the lower level when the 2 p.m. count clears shall not be taken back to the lower level until 5:00 p.m. unless recalled early by the Kitchen Supervisor.

3.        Housing Unit 4B-2, 4B-3, 4B-4, 4B-S, 4B-6 and 4B-7

a. Cells #2, 3, and 4 in Housing Unit 4B is reserved for Special Needs inmates. Placement in those cells shall be controlled by the Mental Health Staff. Housing Unit officers are never to select and approve a cellmate for a special needs inmate without the written permission of a mental health staff member.

b. Cells 5, 6 & 7 are reserved for newly arriving inmates who shall be oriented in groups by the Caseworker assigned to this unit. These inmates shall be designated by the Classification staff and not by the Rousing Unit Officer.

4.        The Housing Unit Management Log shall indicate that these cells are reserved for "Special Needs Inmate Only" or "Orientation only".

DOC Post Order: Housing Officer                                    Page 11 of 11



## Your Missouri Courts

Search for Cases by: [ Select Search Method... ▾ ]    **.net**

Judicial Links  |  eFiling  |  Help  |  Contact Us  |  Print      GrantedPublicAccess   Logoff NKMEADOR89

### 1522-CR00471-01 - ST V CIARA JONES

| Case Header | Parties & Attorneys | Docket Entries | Charges, Judgments & Sentences | Service Information | Filings Due | Scheduled Hearings & Trials | Civil Judgments | Garnishments/ Execution |

This information is provided as a service and is not considered an official court record.

### Charge/Judgment

**Description:** Sexual Contact with Prisoner or Offender by Probation/Parole Officer/Emplyee of Jail, Prison, Correctional Facility *{ Felony D RSMo: 566.145 }*

**Date:** 02/01/2014      **Code:** 2213000      **Disposition:** *Suspended* – 06/09/2015

**OCN:** CJ005940      **Arresting Agency:** ST LOUIS METROPOLITAN POLICE

### Status

**Status:** Suspended Imposition of Sent.

**Suspended Date:** 10/23/2015

**Text:** DFT IS SENTENCED TO 4 YRS SIS NOT TO REPORT BENCH PROBTION

---

**Facility Name:** PROBATION      **Agency:** CITY OF ST LOUIS

**Classification:** UNSUPERVISED

**Outcome:** Probation Continued

**Start Date:** 10/23/2015      **Assigned Length:** 4 Years      **Completed Date:** 11/23/2015

---

**Facility Name:** PROBATION      **Agency:** CITY OF ST LOUIS

**Classification:** UNSUPERVISED

**Start Date:** 10/23/2015      **Assigned Length:** 4 Years

### Next Charge/Judgment

**Description:** Sexual Contact with Prisoner or Offender by Probation/Parole Officer/Emplyee of Jail, Prison, Correctional Facility *{ Felony D RSMo: 566.145 }*

**Date:** 02/01/2014      **Code:** 2213000      **Disposition:** *Suspended* – 06/09/2015

**OCN:** CJ005940      **Arresting Agency:** ST LOUIS METROPOLITAN POLICE

### Status

**Status:** Suspended Imposition of Sent.

**Suspended Date:** 10/23/2015

**Text:** DFT IS SENTENCED TO 4 YRS SIS NOT TO REPORT BENCH PROBTION

---

**Facility Name:** PROBATION      **Agency:** CITY OF ST LOUIS

**Classification:** UNSUPERVISED

**Outcome:** Probation Continued

**Start Date:** 10/23/2015      **Assigned Length:** 4 Years      **Completed Date:** 11/23/2015

---

**Facility Name:** PROBATION      **Agency:** CITY OF ST LOUIS

**Classification:** UNSUPERVISED

**Start Date:** 10/23/2015      **Assigned Length:** 4 Years

Click here to receive MOVANS phone/e-mail notices of future hearings on this c

**PLAINTIFF'S EXHIBIT**

1b



Search for Cases by: Select Search Method... ▼

**Judicial Links** | **eFiling** | **Help** | **Contact Us** | **Print**　　　　　GrantedPublicAccess  Logoff NKMEADOR89

0922-CR04326-01 - ST V TONY WEST

| Case Header | Parties & Attorneys | Docket Entries | Charges, Judgments & Sentences | Service Information | Filings Due | Scheduled Hearings & Trials | Civil Judgments | Garnishments/ Execution |

This information is provided as a service and is not considered an official court record.

### Charge/Judgment

**Description:** Sexual Contact with Prisoner or Offender by Probation/Parole Officer/Emplyee of Jail, Prison, Correctional Facility { *Felony D RSMo: 566.145* }

| | | |
|---|---|---|
| **Date:** 01/09/2009 | **Code:** 2213000 | **Disposition:** *Jury Verdict-Guilty* - 11/01/2012 |
| **OCN:** C2033820 | | **Arresting Agency:** ST LOUIS METROPOLITAN POLICE |

### Sentence

**Sentence:** Incarceration DOC

| | | |
|---|---|---|
| **Sentence Date:** 12/13/2012 | **Start Date:** 12/13/2012 | **Length:** 3.6 Years |

Click here to receive MOVANS phone/e-mail notices of future hearings on this case

Case.net Version 5.13.16.6　　　　　Return to Top of Page　　　　　Released 06/08/2017







# Department of Public Safety
# St. Louis City
# Division of Corrections



## Monthly Report

| Dale Glass, Commissioner | April 2017 |
| --- | --- |

PLAINTIFF'S EXHIBIT

1 D

tabbies®

April 2017

## SECTION 3.
## Reporting of Statistics
## Bill Board 9

1)      the number of inmates in each security risk group as defined by the division's classification system directive,

   *Division does not have or classify people by security risk groups*

2)      the number of inmates subject to enhanced restraints, including but not limited to, shackles, waist chains, and hand mittens,

   *Division uses restraints when transported from point A to point B, and will utilize restraints when deemed appropriate*

3)      the number of inmates sent to administrative segregation housing during the period,
   *One Hundred--Five (105)*

4)      the number of inmates sent to administrative segregation from mental observation housing areas or mental health units,
   *Zero (0)*

5)      the number of inmates, by highest infraction offense grade as classified by the division,
   *One Hundred-Five (105)*

6)      the number of inmates serving punitive segregation in the following specified ranges: less than 10 days, 10 to 30 days, 31 to 90 days, 91 to 180 days, 181 to 365 days, and more than 365 days,  **(DOC, does not have punitive segregation, the information listed below is disciplinary segregation)**

| 10 days or less | 10 to 30 days | 31 to 90 days | 91 to 180 days | 181 to 365 days | more than 365 days |
|---|---|---|---|---|---|
| 96 | 08 | 1 | 0 | 0 | 0 |

7)      the number of inmates receiving mental health services,
   *Five Hundred and Eighty-One (581)*

8)      the number of inmates 21 years of age and under,
   *Two Hundred and Eleven (211)*

9)      the number of inmates over 21 years of age in 10-years-of-age intervals,

| 22 yr-32 yr | 33yr-43 yr | 44yr-54yr | 55yr-65yr | 66yr-76yr | 77-87yr |
|---|---|---|---|---|---|
| 585 | 339 | 174 | 73 | 3 | 1 |

10)    the race and gender of inmates,

| Black Males | White Males | Black Females | White Females |
|---|---|---|---|
| 1092 | 190 | 71 | 30 |

11)    the number of inmates who received infractions while in administrative segregation housing,
*Thirty Six (36)*

12)    the number of inmates who received infractions that lead to the imposition of additional administrative segregation time,
*Eleven (11)*

13)    the number of inmates who committed suicide,
*Zero (0)*

14)    the number of inmates who attempted suicide,
*Zero (0)*

15)    the number of inmates on suicide watch,
*Two Hundred and Ninety -Nine (299)*

16)    the number of inmates who caused injury to themselves (excluding suicide attempt),
*Zero (0)*

17)    the number of inmates seriously injured while in administrative segregation, housing,
*Zero (0)*

18)    the number of inmates who were sent to non-psychiatric hospitals outside the city jails,
*Nineteen (19)*

19)    the number of inmates who died (non-suicide),
*Zero (0)*

20) *    the number of inmates transferred to a psychiatric hospital from administrative segregation (not an MHU),
*Zero (0)*

21) *    the number of inmates transferred to a psychiatric hospital from disciplinary segregation (not an MHU),
*Zero (0)*

22) *    the number of inmates transferred to a psychiatric hospital from an MHU, disaggregated by program, status, or classification,
*Zero (0)*

23) *   the number of inmates moved from general administrative segregation to an
        MHU, disaggregated by program, status, or classification,
        *Zero (0)*

24) *   the number of inmates placed into an MHU following a disciplinary hearing,
        disaggregate by program, status, or classification,
        *Zero (0)*

25) *   the number of inmates moved from an MHU to disciplinary segregation,
        disaggregated by program, status, or classification,
        *Zero (0)*

26)     the number of inmates prescribed anti-psychotic medications, mood stabilizers, or
        anxiety medications, disaggregated by the type of medication,
        *Two Hundred and Thirty Nine (239)*

27)     the number of requests made by inmates for medical or mental health treatment
        and the number granted,
        *Six Hundred and Eighty-Eighty (688) Requests made*
        *Six Hundred and Eighty-Eighty (688) Granted*

28)     the number of requests made by inmates to attend congregate religious services
        and the number granted
        *Inmates can attend services at anytime if not serving disciplinary time*

29)     the number of requests made by inmates for assistance from the law library and
        the number granted,
        *One Hundred and Ninety-One (191) Request made*
        *One Hundred and Ninety-One (191) Granted*

30)     the number of requests made by inmates to make telephone calls and the number
        granted, disaggregated by weekly personal calls and other permissible daily calls,
        *Phones are available for use by everyone*

31)     the number of inmate recreation days and the number of recreation hours
        attended,
        *Recreation is seven (7) days a week*

32)     the number of individual recreation hours that were offered to inmates prior to six
        a.m.,
        *Recreation does not occur prior to six a.m.*

33)     the number of inmates shower days and the number of showers taken,
        *Showers available seven (7) days a week*

34)     the number of inmates who received visits,
        *All inmates are allowed visits*

35)     the number of instances of allegations of use of force,
        *Nineteen (19)*

36)   the number of instances of use of force A, (injury that requires treatment beyond first aid, or requires hospitalization)
*Zero (0)*

37)   the number of instances of use of force B, (injury that requires no hospitalization, but minor first aid)
*Zero (0)*

38)   the number of instances of use of force C, (no injuries to staff or inmates)
*Nineteen (19)*

39)   the number of instances in which contraband was found,
*Two (2)*

40)   the number of instances of allegations of staff-on-inmate sexual assault,
*Zero (0)*

41)   the number of instances of substantiated staff-on-inmate sexual assault,
*Zero (0)*

42)   the number of instances of allegations of inmate-on-staff sexual assault, and
*Zero (0)*

43)   the number of instances of substantiated inmate-on-staff sexual assault,
*Zero (0)*


\*   *Please note that for statements numbered 20-25, the Division of Corrections does not have a Mental Health Unit (MHU), the number represents those individuals who are on Mental Health Status.*

CITY OF ST. LOUIS
DIVISION OF CORRECTIONS
Confined Population Overview

April 1-30, 2017

| Facility | Current Census – April 1-30, 2017 |
|---|---|
| **Medium Security Institution Total** | 753 |
| MSI Males | 660 |
| MSI Females | 93 |
| **City Justice Center Total** | 630 |
| CJC Males | 622 |
| CJC Females | 8 |
| **Division of Corrections Total** | 1383 |
| DOC Males | 1282 |
| DOC Females | 101 |
| **Average Daily Population - Overall** | (m) 1304 (f) 104 |
| CJC Average Daily Population | (m) 627  (f) 9 |
| MSI Average Daily Population | (m) 677  (f) 95 |
| **Annual Population Average** | 1408 |

PRE-TRIAL CONFINEMENT

| Most Serious Charge Pending | Current Census | Average Length of Stay |
|---|---|---|
| Felony | 1094 | 190 |
| Misdemeanor | 58 | 102 |
| Ordinance | 1 | 20 |
| Parole Violation w/Pending Charges | 62 | 201 |
| Technical Probation Violation | 84 | 90 |
| Probation Violation w/Pending Charges | 94 | 141 |

SENTENCED POPULATION

| Jurisdiction | Current Census | Average Length of Stay |
|---|---|---|
| State Total | 12 | 143 |
| Felony | 6 | 203 |
| Misdemeanor | 6 | 84 |
| City Ordinance | 0 | 0 |