UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| TONI DEMYERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:17-cv-02130-AGF |
| | ) |
| THE CITY OF ST. LOUIS, et. al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

The case arises out of the April 20, 2017, alleged sexual assault of Plaintiff by then-deputy sheriff Christopher Jones ("Jones") while she was in custody as a pretrial detainee. Plaintiff filed suit in the Circuit Court of St. Louis City on June 5, 2017, asserting claims under 42 U.S.C. § 1983 against the City of St. Louis ("City"); Jones, in his individual and official capacities; City Sheriff Vernon Betts ("Betts"), in his individual and official capacities; City Division of Corrections Commissioner Dale Glass ("Glass"), in his individual and official capacities; and City Medium Security Institute ("MSI") Superintendent Jeffrey Carson ("Carson"), in his individual and official capacities.[1] Defendants subsequently removed the case to federal court on the basis of federal question jurisdiction.

On May 14, 2018, the Court dismissed Plaintiff's claims against Defendants Glass, Carson, and Jones[2] in their official capacities only. ECF No. 50. Thus, the only

---

[1] While Plaintiff's original complaint also included state law claims, the most recently filed complaint—the third amended complaint—does not contain any state law claims.

[2] Jones was represented by counsel in his official capacity. He remains a defendant

remaining claims in Plaintiff's third amended complaint are § 1983 claims against the City and Betts in his official capacity alleging municipal liability; against Jones in his individual capacity; and against Betts, Glass, and Carson, in their individual capacities, for failure to train or supervise.³  The matter is now before the Court on Defendants' motion (ECF No. 72) for summary judgment.  For the reasons set forth below, the Court will grant Defendants' motion.

## BACKGROUND

Viewing the evidence and all reasonable inferences in the light most favorable to Plaintiff, for purposes of the motion before the Court, the record establishes the following. Plaintiff was a pretrial detainee incarcerated in MSI on charges of robbery in the first degree and armed criminal action.  On April 20, 2017, she was transported by two deputy sheriffs from MSI to the St. Louis City Justice Center ("CJC"), where she understood she had a court appearance.  Defendant Jones, a deputy sheriff who worked in the transfer holds division of the Sheriff's Department, submitted Plaintiff's transfer order to a more junior deputy, Tim Walsh, who submitted the transfer order to MSI, despite believing that

---

in this case in his individual capacity, pro se, and appears to be in default.

³   The Court notes that Plaintiff's third amended complaint contains four unlabeled counts with largely indiscernible allegations.  Defendants identified the following claims as those raised in the third amended complaint: (1) Defendants had a policy that allowed the improper transfer of inmates, as well as the transfer of female inmates without a female guard present, which creates a risk of sexual assault; (2) Defendants had an unofficial policy allowing "sex for food" between guards and inmates; and (3) Defendants failed to provide its guards with training on how to identify and prevent sexual harassment and abuse against detainees.  ECF No. 74 at 1-2.  Plaintiff does not dispute that those are the claims raised, nor does she assert the existence of any other claims.  Therefore, the Court will assume these are the claims raised by Plaintiff in this lawsuit.

the request seemed suspicious. Walsh did so because Jones was well-established and well-respected within the Sheriff's Department. Plaintiff did not in fact have a court appearance scheduled that day.

When Plaintiff arrived at the CJC, she was taken to a holding tank to await her purported court appearance. Jones informed Plaintiff that he wanted to see her, and he put food obtained from an outside location in the neighboring cell. Jones then moved Plaintiff to the neighboring cell, and she ate the food provided by Jones. After she finished eating, Jones said "You got yours. Now where's mine?" Jones told Plaintiff he was "hands-on" and that she was going to "turn around." He then grabbed Plaintiff's breast, made her turn around, put his hands down Plaintiff's pants, and touched her "private area." ECF No. 17 at ¶ 15. Jones then stopped his assault on Plaintiff, perhaps as the result of other deputies approaching the cell.[4] Plaintiff was then transported back to MSI.

Upon returning to MSI, Plaintiff filed a complaint against Jones with Lieutenant Rose Johnson, who is in the processing unit of the City's Division of Corrections. Lieutenant Johnson notified her supervisor, and law enforcement were called the same day. Superintendent Carson called Commissioner Glass, who then alerted the City Sheriff's Department of the incident. Sheriff Betts directed Sergeant Tim Haill[5] to conduct an investigation into the allegations. After observing the camera recording of the incident,

---

[4] The record is unclear as to what exactly caused Jones to stop his physical contact with Plaintiff.

[5] Sheriff Betts testified that Tim Haill, who works for Internal Affairs at the Sheriff's Department, conducts investigations into allegations of misconduct. Betts Depo. 77:13-16.

3

Sergeant Haill reported his observations to Sheriff Betts, who then observed the tape for himself. Sheriff Betts sent Jones home that same day, and Jones was formally suspended on April 24, 2017. Jones ultimately resigned his position before he was formally terminated. The Sheriff's Department did not conduct any further investigation of Plaintiff's complaints because it was "clear what happened." Betts Depo. 75:11-14.

Investigator Percy Harrington investigated Jones's assault on Plaintiff on behalf of the City Division of Corrections. He conducted an investigation because Plaintiff reported the incident to Division of Corrections employees. Investigator Harrington did not have any concerns over the course of his investigation that other sheriffs were involved in the incident, and he had never before investigated any other claims of improper transfer. He had, however, investigated complaints from inmates pertaining to physical contact, although such contact was not necessarily sexual in nature.

When inmates are held at MSI, they are in the custody of the City's Division of Corrections. However, the City Sheriff's Department is responsible for the transportation of inmates. When an inmate is scheduled to appear in court, the Sheriff's Department presents transfer orders to the Division of Corrections, which then prepares the inmate for transfer. The order sheet contains the inmate's name, date of birth, address, picture, and the division to which they are going. It is not uncommon for the Sheriff's Department to submit transfer orders throughout the day. It is the responsibility of the Division of Corrections to cross-check the docket sheet with the transfer list supplied by the Sheriff's Department. The Division of Corrections is not supposed to allow an inmate to be transferred without the proper paperwork.

4

The Sherriff's Department and the Division of Corrections do not share policies and procedures, nor do they exercise oversight over one another. The Division of Corrections has a policy against sexual abuse and harassment of inmates, and the Sheriff's Department has a policy of limiting physical contact with persons in custody to that which is necessary to ensure safety. The Sheriff's Department also has a policy against providing outside food to inmates, as well as a policy against insubordination or disrespect toward superior officers. The Sheriff's Department and the Division of Corrections both require their employees to undergo training regarding their respective policies. The Sheriff's Department also provides informal training to junior officers on inmate transportation by way of shadowing senior officers.

Upon review of the record, Sheriff Betts testified, by way of deposition, to the following. Prior to the incident with Plaintiff, Sheriff Betts had not been made aware of any complaints regarding improper inmate transfer, nor did he have cause to be concerned that such transfers were taking place. Jones had a good reputation prior to his assault on Plaintiff, including being punctual and having good attendance. Sheriff Betts had never received any complaints about Jones prior to the incident with Plaintiff.

Sheriff Betts recalls one other deputy sheriff engaging in misconduct after the incident involving Plaintiff,[6] which was brought to Sheriff Betts's attention. Specifically, he recalls an incident involving then-deputy sheriff Jack Price, who had been "involved with some of the inmates" in a sexual capacity. Betts Depo. 61:10-15. Then-deputy

---

[6] The record is not clear as to exactly when the incident involving this deputy occurred. However, deposition testimony contained in the record reflects that the incident occurred after the incident involving Plaintiff.

Price was caught after he was recorded having a telephone conversation with an inmate, and Sheriff Betts suspended, and then terminated, Price. Other than the incidents involving Jones and Price, Sheriff Betts was not aware of any other complaints or reports about staff members having inappropriate relationships or sexual contact with prisoners and inmates, nor was he aware of instances occurring prior to his election as Sheriff in January 2017. He was also unaware of any complaints of staff members bringing outside food to inmates.

Superintendent Carson testified, by way of deposition, about an incident involving a Department of Corrections staff member engaging in sexual contact with an inmate in 2015. An investigation was conducted, and the staff member was ultimately fired. He also recalled an incident in which a staff member was talking with an inmate over the telephone, which resulted in the staff member being fired.

Plaintiff submitted the affidavit of Regina Steed, who swore that on or around December 4, 2015, she was a detainee at the Women's Eastern Reception, Diagnostic and Correctional Center, in Vandalia, Missouri. She states that during her incarceration, she was improperly transferred from her facility to the CJC to attend court six or seven times, despite not having a scheduled court appearance. On those occasions, Jones engaged in sexual contact with her, including, on one occasion, sexual intercourse. Sometimes Jones would provide food or money in Ms. Steed's account in exchange for sexual acts. Ms. Steed claims that other sheriffs were aware of Jones' actions and described one occasion in which a sheriff named "Price" and another were present.

Ms. Steed states that in October 2016, she complained to "Sheriff Mitchell" and

"Sheriff Harrison" that she was being transferred without a court hearing. Ms. Steed asserts that every time she was called without a court date, she complained at MSI intake. Ms. Steed asserts that the last time that she was wrongfully called to the CJC, she complained to "Ms. Lewis," who then contacted Lieutenant Johnson.[7] According to Ms. Steed, Lieutenant Johnson confirmed that Ms. Steed did not have a court hearing scheduled that day and returned her to the facility in Vandalia, after which Jones never again improperly transferred Ms. Steed. Ms. Steed does not state that she told Lewis or Johnson about any sexual contact. She is not aware of any investigation having been conducted regarding her complaints. Lastly, Ms. Steed states she is aware of two other female inmates for whom Jones ordered transfers and then engaged in sexual misconduct, and she provides the name of one of the inmates. She does not, however, provide any dates on which these incidents occurred, identify how she knows of the incidents, or state whether the other female inmates ever reported the sexual misconduct. However, Ms. Steed states that it was "common knowledge" that sheriffs were engaging in sexual acts with inmates. ECF No. 79-8.

Lieutenant Johnson testified to the following at her deposition. Inmate complaints regarding improper transfer were minimal, and she had occasionally discovered that an inmate was ordered transferred but did not have a court appearance scheduled on the docket sheet. In those instances, she would call the Sheriff's Department and return the inmate to his or her cell. She was aware of rumors that deputy sheriffs were talking on the phone with inmates or giving them food items, but none of the purported misconduct was

---

[7] Ms. Steed's affidavit does not contain a date for this most recent complaint.

sexual in nature. And she had never heard any complaints from inmates about sexual misconduct, other than Plaintiff's case. Lieutenant Johnson recalls the name of Ms. Steed and she is familiar with Sheriff Mitchell but does not recall the events detailed in Ms. Steed's affidavit.

## **ARGUMENTS OF THE PARTIES**

Defendants argue that Plaintiff cannot establish her claim for municipal liability because there is no underlying constitutional violation, and Plaintiff cannot present evidence of a City policy, custom, or practice that caused such a violation. Defendants also argue that Plaintiff's claims fail against Sheriff Betts, Commissioner Glass, and Superintendent Carson, in their individual capacities, because she cannot establish that they were personally involved in or directly responsible for Jones's sexual assault against Plaintiff. Further, they maintain that these Defendants, in their individual capacities, are entitled to qualified immunity because their conduct comported with and did not violate clearly established law.

In response, Plaintiff contends that there exists evidence in the record demonstrating a continuing, widespread pattern of unconstitutional misconduct by City employees, including sexual misconduct and improper transfers of female inmates. She also claims that she has made a sufficient showing that Defendants knew about staff sexual misconduct to varying degrees and failed to act. Plaintiff further maintains that Defendants had a custom of laxness or inaction toward allegations of sexual misconduct that, paired with Defendants' custom of improper transfers, caused the assault suffered by Plaintiff.

Plaintiff also argues that there is evidence in the record that Sheriff Betts knew that

there was a pattern of improper transfers and sexual misconduct by his employees, that he was indifferent to reports of such acts, and that he failed to take steps to prevent improper transfers or sexual contact between prisoners and employees, resulting in harm to Plaintiff. This, Plaintiff maintains, is sufficient to overcome summary judgment on Plaintiff's claim against Sheriff Betts in his individual capacity.[8]

## DISCUSSION

**Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." "[T]he burden of demonstrating that there are no genuine issues of material fact rests on the moving party," and the court must view "the evidence and the inferences which reasonably may be drawn [therefrom] in the light most favorable to the non moving party." *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015).

**Municipal Liability**

Plaintiff asserts claims against the City[9] and Sheriff Betts, in his official capacity,[10]

---

[8] In her response to Defendants' motion for summary judgment, Plaintiff concedes that summary judgment should be entered in favor of Defendants Glass and Carson in their individual capacities because they had no supervisory authority over Jones. Therefore, the Court will grant summary judgment against Plaintiff on her claims against Glass and Carson in their individual capacities.

[9] Defendants attempt to make a distinction between the City and the Sheriff's Department such that actions taken by employees of the Sheriff's Department can never be imputed to the City. However, "the Sheriff's Office is a municipal department of the City of St. Louis, and is not itself an entity that can be sued under § 1983." *See, e.g., Turner v. St. Louis City Sheriff's Office*, No. 4:17-CV-2280-DDN, 2017 WL 5633112, at *2 (E.D.

9

stemming from the improper transfer of inmates; the transfer of female inmates without a female guard present; an unofficial "sex for food" policy; and the failure to train and supervise its employees "to identify potential threats to prisoner safety." ECF No. 77 at 11.

"In an action under § 1983, a municipality . . . cannot be liable on a respondeat superior theory, but can be held liable if a constitutional violation resulted from a municipal policy or custom." *A.H. v. St. Louis Cty., Mo.*, 891 F.3d 721, 728 (8th Cir. 2018). "To prove the existence of a policy, a plaintiff must point to 'an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters.'" *Schaffer v. Beringer*, 842 F.3d 585, 596 (8th Cir. 2016) (quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999)). "Further, the plaintiff must prove that the policy was the 'moving force' behind a constitutional violation." *Id.* (quoting *Monell*, 436 U.S. at 694). To establish a claim for "custom" liability, a § 1983 plaintiff must demonstrate (1) a widespread, persistent pattern of unconstitutional conduct, (2) deliberate indifference or tacit authorization of such conduct

---

Mo. Nov. 21, 2017), *appeal dismissed*, No. 17-3715, 2018 WL 2979914 (8th Cir. Feb. 21, 2018). Although Defendants present evidence that the Division of Corrections and the Sheriff's Department were operating separately without mutual oversight or overlap, both are departments falling under the umbrella of the City. Therefore, to the extent Defendants argue that the City cannot be held liable for actions taken by Jones or other sheriffs because Plaintiff was in the "jurisdiction" of the Sheriff's Department, that argument is rejected.

[10] At the outset, the Court notes that a "suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent." *Parrish v. Ball,* 594 F.3d 993, 997 (8th Cir. 2010) (citing *Elder–Keep v. Aksamit,* 460 F.3d 979, 986 (8th Cir. 2006)). Here, a suit against Defendant Betts in his official capacity is actually a suit against the City.

by the municipality's policymaking officials, and (3) a direct causal link between the custom and the injury alleged. *Johnson v. Douglas Cty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013).

A city may also be liable under § 1983 if it is deliberately indifferent to a substantial risk of serious harm to a pre-trial detainee and fails to protect the detainee. *Glaze v. Byrd*, 721 F.3d 528, 531 (8th Cir. 2013). Plaintiff must show that she was "incarcerated under conditions posing a substantial risk of serious harm" and that the City "knew of and disregarded the risk to the inmate's safety." *Id.* (analyzing failure to protect claim against an individual). "[D]eliberate indifference can be predicated upon knowledge of a victim's particular vulnerability (though the identity of the ultimate assailant is not known in advance of the attack), or, in the alternative, an assailant's predatory nature (though the identity of the ultimate victim is not known in advance of the attack)." *Stevens v. City of St. Louis*, No. 4:10CV951 JCH, 2012 WL 1906362, at *6 (E.D. Mo. May 25, 2012) (citing *Brown v. Budz,* 398 F.3d 904, 915 (7th Cir. 2005)). Alternatively, "if a plaintiff presents evidence of 'very obvious and blatant circumstances indicating the defendant knew the risk existed, the jury may properly infer that the official *must* have known." *Whitson v. Stone Cty. Jail*, 602 F.3d 920, 927 (8th Cir. 2010) (citation omitted) (emphasis in original).

Plaintiff argues that "there is a pattern of Sheriff's Deputies and employees of the [Division] of Corrections failing to follow proper procedure when transferring prisoners. This persistent failure was relied upon by a pack of Sheriff's Deputies who sexually assaulted these women, because they knew no one was going to question what they were doing." ECF No. 77 at 1. Plaintiff argues that inmate transfers occurred without

11

sufficient oversight or safeguards, such as a procedure to confirm whether an inmate appeared on the court docket, which created a substantial risk to the health and safety of prisoners.

Here, Plaintiff has failed to present evidence that the City knew about the existence of the improper transfers *and* that the City knew these improper transfers placed detainees at a substantial risk of harm or otherwise violated their constitutional rights. Nor did Plaintiff present any evidence that the improper transfers constituted a widespread pattern or was a very common occurence. The mere fact that inmates were at times improperly transferred does not, without something more, constitute a constitutional violation. Further, Plaintiff has not shown that improper transfers pose a risk of harm so obvious that a jury could reasonably infer that the official *must* have known.

On the other hand, the City has presented evidence that it had no knowledge that improper transfers were taking place, let alone that those transfers were being used as a vehicle for sexual misconduct. For instance, Investigator Harrington did not recall ever investigating an employee of the Division of Corrections for the improper transfer of an inmate, other than Plaintiff's complaint.[11] Likewise, Sheriff Betts acknowledged that Plaintiff's transfer was improper but stated that he had never heard of another complaint of improper inmate transfers. Lieutenant Johnson testified that although she was aware of some instances where an inmate was erroneously ordered for a court appearance that did not appear on the docket sheet, such errors were infrequent. And there is no evidence that

---

[11] Investigator Harrington testified that inmate complaints typically trigger an investigation, and the Superintendent or Chief of Security would then assign an investigator to the case. Harrington Depo. 11:9-13.

Lieutenant Johnson ever reported the occurrence of improper transfers to her superiors, such that the City would be on notice. *Cf. Franklin v. Tatum*, 627 Fed. App'x 761 (11th Cir. 2015) (denying summary judgment because the county was aware of previous complaints about cross-gender transport and the inappropriate behavior of a particular sheriff, who later sexually assaulted the plaintiff).

Plaintiff relies heavily on the affidavit of Ms. Steed to create a genuine issue of fact in this case. However, Ms. Steed does not claim to have reported Jones's sexual misconduct; instead, she complained only about being transferred without having a scheduled court date. Thus, Ms. Steed's affidavit does not assist Plaintiff to prove that the City had knowledge that inmates were being placed at substantial risk of serious harm as a result of improper transfers.

In addition, there is no evidence, other than mere conclusory allegations, that the City had actual or constructive notice of a pattern of sexual misconduct, such as a "food for sex" arrangement, such that the City could be found to have been deliberately indifferent. *See Mick v. Raines*, 883 F.3d 1075 (8th Cir. 2018) (holding that the mere existence of three detainees describing alleged constitutional violations was not sufficient to establish a genuine issue of material fact regarding whether there was a widespread custom or practice of unconstitutional misconduct, known to and unaddressed by policymaking officials). And there is no evidence that City officials failed to act on complaints of sexual misconduct by its employees, creating an unofficial custom to that effect. *See, e.g., Parrish v. Luckie*, 963 F.2d 201, 204–05 (8th Cir. 1992) (reviewing the "detailed and compelling" evidence the plaintiff presented that the defendant police department avoided,

ignored, and covered up complaints of physical and sexual misconduct by officers). Instead, evidence in the record suggests that any report of sexual misconduct was investigated, substantiated evidence of misconduct resulted in the termination of the employee, and both the Sheriff's Department and the Division of Corrections had policies against inappropriate physical contact with detainees. *See Lazarus v. City of Dumas, Ark.*, 123 F. App'x 266, 267 (8th Cir. 2005) (affirming summary judgment where the city had policies in place to protect inmate safety, the city properly investigated the complaint to sexual misconduct, and there was no evidence of earlier complaints of sexual misconduct); *cf. Ware v. Jackson Cty., Mo.*, 150 F.3d 873, 885 (8th Cir. 1998) (holding that "[u]npunished crimes tend to breed more criminal behavior" and that "the County's custom of laxness or inaction towards allegations of sexual misconduct was the 'moving force'" behind the plaintiff's injury).

To the extent that Plaintiff asserts a claim that Defendants allowed female inmates to be transported by male guards without a female guard present, which Defendants knew created an excessive risk to the female inmates' health and safety, that claim fails for lack of any supporting evidence in the record.[12] To the extent that Plaintiff argues that there existed a custom of subordinates blindly following orders of their superiors, which allowed the assault against Plaintiff to occur, that claim fails for lack of causation. *S.M. v. Lincoln Cty.*, 874 F.3d 581, 585 (8th Cir. 2017) ("But where the claim is that municipal action lawful on its face caused an employee to inflict constitutional injury, 'rigorous standards of

---

[12] In fact, although this issue is raised by Defendants in their motion for summary judgment, Plaintiff fails to respond or offer any evidence in support.

culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.'").

Lastly, and for the reasons stated previously, Plaintiff's claim against the City for failure to train or supervise also fails. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city [or county] be liable for such a failure under § 1983." *Mendoza v. United States Immigration & Customs Enf't*, 849 F.3d 408, 420 (8th Cir. 2017) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). Further, "where it becomes clear that an employee or group of employees needs close and continuing supervision and 'the municipality fails to provide such supervision, the inevitable result is a continuation of the misconduct." *Ware*, 150 F.3d at 885 (quoting *Harris v. City of Pagedale*, 821 F.2d 499, 508 (8th Cir. 1987).

Here, the record reflects that City employees received training on written policies concerning inappropriate physical contact with inmates. Although Plaintiff presented some evidence of other instances of sexual misconduct, there is no evidence that the City was aware of the misconduct and deliberately disregarded it. *See, e.g., Andrews v. Fowler,* 98 F.3d 1069, 1078 (8th Cir. 1996) (holding that two prior complaints regarding the offending officer making inappropriate advances toward minor females was insufficient to impose § 1983 liability because the complaints were not sufficiently similar to the sexual assault perpetrated by the offending officer such that the city would be on notice). And Plaintiff has not presented any evidence that there was "a pattern of similar constitutional violations by untrained employees," *Connick v. Thompson*, 131 S. Ct. 1350,

1560-61 (2011), or that the "failure to train officers or employees is so likely to result in a violation of constitutional rights that the need for training is patently obvious," *Thelma D. By & Through Delores A. v. Bd. of Educ. of City of St. Louis*, 934 F.2d 929, 934 (8th Cir. 1991). For these reasons, Defendants' motion for summary judgment on Plaintiff's municipal liability claims will be granted.

**Qualified Immunity**

A supervisor may be held individually liable under § 1983 if he either "directly participates in the constitutional violation or if he fails to train or supervise the subordinate who caused the violation." *Brockinton v. City of Sherwood, Ark.,* 503 F.3d 667, 673 (8th Cir. 2007). "A supervisory officer is entitled to qualified immunity for a § 1983 failure to train action unless a reasonable supervisor would have known that his training program (or lack thereof) was likely to result in the specific constitutional violation at issue." *Parrish*, 594 F.3d at 1002. "When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *Marsh v. Phelps Cty.*, 902 F.3d 745, 754 (8th Cir. 2018) (citation omitted). A supervisor may also be liable if he fails to adequately receive, investigate or act upon complaints of unconstitutional activity by subordinates. *Andrews,* 98 F.3d at 1078.

Upon review of the record, the Court concludes that there is no evidence that Sheriff Betts had actual or constructive notice of Jones's misconduct or any inadequacies in

training or supervision. Specifically, there is no evidence that Sheriff Betts had actual notice of, and therefore was deliberately indifferent to, a need for more or different training on how to transfer inmates and prevent sexual assault. *See Connick*, 131 S. Ct. at 1360-61. Accordingly, Sheriff Betts is entitled to qualified immunity.

## CONCLUSION

**IT IS HEREBY ORDERED** that Defendants' motion for summary judgment is **GRANTED**. ECF No. 72. All of Plaintiff's claims, except those against Defendant Jones in his individual capacity, are **DISMISSED**.

**IT IS FURTHER ORDERED** that Plaintiff shall, within **fourteen (14) days** of the date of this Order, file a motion for entry of default against Defendant Christopher Jones, in his individual capacity, by the Clerk of Court under Federal Rule of Civil Procedure 55(a) and, if appropriate, a motion for default judgment under Rule 55(b), supported by all necessary affidavits and documentation.

Failure to comply may result in dismissal of this action without prejudice.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 31st day of July, 2019.

17